# ILLINOIS OFFICIAL REPORTS

## Supreme Court

***In re Karavidas*, 2013 IL 115767**

| | |
|---|---|
| Caption in Supreme Court: | *In re* THEODORE GEORGE KARAVIDAS, Attorney-Respondent. |
| Docket No. | 115767 |
| Filed | November 15, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where an attorney was not shown to have violated one of the Rules of Professional Conduct in breaching his fiduciary duty as executor of his father's estate, he could not be disciplined under them or under Supreme Court Rule 770—charges dismissed. |
| Decision Under Review | Disciplinary proceeding. |
| Judgment | Charges dismissed. |
| Counsel on Appeal | Steven R. Splitt, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.<br><br>Samuel A. Kavathas, Jr., of Kavathas and Castanes, of Chicago, for respondent. |

Justices

CHIEF JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Kilbride, Burke, and Theis concurred in the judgment and opinion.

Justice Thomas dissented, with opinion, joined by Justice Karmeier.

## OPINION

¶ 1    The Administrator of the Attorney Registration and Disciplinary Commission (ARDC) filed a one-count complaint against respondent, Theodore George Karavidas, charging him with various violations of the Illinois Rules of Professional Conduct. The Hearing Board found that he breached his fiduciary duty to the beneficiaries of his father's estate by converting funds from the estate and recommended that he be suspended for four months. The Review Board reversed and recommended that the charges be dismissed. The Administrator filed a petition for leave to file exceptions pursuant to Supreme Court Rule 753(e) (Ill. S. Ct. R. 753(e) (eff. Sept. 1, 2006)), which this court allowed.

¶ 2                             BACKGROUND

¶ 3    Respondent was admitted to practice law in Illinois in 1979 and thereafter worked for the City of Chicago, the Attorney General, and several law firms. In 1988, he opened his own practice, focusing on personal injury law. He has no record of previous disciplinary actions and no professional experience in matters of probate or trusts.

¶ 4    Attorney John Hayes, who specialized in estate and probate matters, prepared a will and trust documents for respondent's father, George Karavidas. The elder Karavidas executed the documents on February 17, 2000, and died later that day. Respondent was named in the will to be executor of his father's estate and in the trust documents to be successor trustee. Respondent retained Hayes and his law firm, Pedersen & Houpt, to represent him as executor. Hayes filed a petition to probate the estate on April 11, 2000.

¶ 5    The will provided for George's personal property to be given to his wife, Lillian, and directed that the remainder of the estate pour over into the unfunded trust. The will also authorized independent administration of the estate, meaning that the executor was allowed to take actions with regard to the estate without court approval. See 755 ILCS 5/28-1 (West 2000). The probate estate was valued at approximately $700,000 and included investment accounts with PaineWebber and Harris Investors. In addition, the estate included an interest in a family business called Marie's Pizza and Liquors (Marie's).

¶ 6    The trust documents provided that upon George's death and the resulting transfer of estate assets to the trust, the successor trustee was to create two separate trusts. A family trust was to be funded first, in an amount equal to the maximum federal estate tax exemption (then

$675,000); the remaining assets were to be placed in a marital trust for Lillian's benefit. Upon exhaustion of the funds in the marital trust, the principal of the family trust was to be used for Lillian's health and support. In addition, the trustee was given the authority to distribute family trust assets to George's descendants, a group consisting of respondent and his sister, Nadine, provided that the distributions were for the beneficiary's health, support, or education. When making distributions from the family trust, the trustee was instructed to "give primary consideration" to Lillian's needs. Upon Lillian's death, any remaining assets of the family trust were to be distributed in equal shares to respondent and Nadine, without regard to any distributions made to them earlier. However, the trust document also gave Lillian a testamentary power of appointment, under which she could appoint "any one or more" of George's descendants and their spouses to take the principal of the family trust upon her death. Thus, it was not certain that either respondent or his sister would ever receive any funds from this trust.

¶ 7        Respondent did not transfer any estate assets to the existing trust or create the family and marital trusts. On August 9, 2000, he withdrew $50,000 from one of the investment accounts for his own use. In addition, between August 2, 2000, and July 1, 2005, respondent made multiple withdrawals totaling $398,104 from another investment account for his own use. Between February 1, 2001, and October 17, 2005, he deposited $349,604 of his own funds into the same account. He also made payments of his own funds directly to Marie's, his mother, and his sister. The largest deficit of estate funds due to these transactions at any time was $152,104, which was less than one-third of the amount of the entire estate. The Administrator does not allege that any further restitution is owed to the estate.

¶ 8        Respondent also used estate funds to purchase a new Mercedes automobile for Lillian, to pay her health insurance premiums and her real estate taxes, to make contributions to Nadine's Individual Retirement Account (IRA) and to his wife's IRA, to pay a portion of the real estate taxes on the building that housed Marie's, and to pay Nadine's personal income taxes. At the request of Nadine, who operated Marie's, he made advances from the estate of $339,247 to keep Marie's in business. He also paid approximately $20,000 directly to Nadine.

¶ 9        In 2006, Nadine learned that respondent had attempted to sell Marie's without her or her mother's knowledge. She retained an attorney to represent herself and Lillian, and he filed an appearance in the probate case seeking to terminate independent administration. The petition alleged, among other things, that respondent had not circulated an inventory of the assets of the estate or an account of his administration. Later, Lillian and Nadine sought to have respondent removed as executor. Thereafter, the probate court terminated respondent's independent administration of his father's estate, and he resigned as executor. Nadine became executor of the estate.

¶ 10        On December 30, 2009, the Administrator filed a one-count complaint against respondent, alleging that he engaged in: (1) conversion of assets entrusted to him as executor of his father's estate; (2) breach of fiduciary obligations owed to the beneficiaries of the estate; (3) conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Rule 8.4(a)(4) (Ill. R. Prof. Conduct R. 8.4(a)(4) (eff. July 6, 2001)); (4) conduct that is prejudicial to the administration of justice, in violation of Rule 8.4(a)(5) (Ill. R. Prof.

-3-

Conduct R. 8.4(a)(5) (eff. July 6, 2001)); and (5) conduct which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute, in violation of Supreme Court Rule 770 (Ill. S. Ct. R. 770 (eff. Apr. 1, 2004)).

¶ 11 At the hearing, the Administrator called five witnesses, including Lillian and Nadine. Respondent called four witnesses and testified on his own behalf.

¶ 12 Hayes testified that he prepared the will and trust documents and that no assets were placed in the trust prior to George's death. He summarized the terms of the will and trust and explained that the family trust would have to be funded before the estate could be closed. If no funds remained after fully funding the family trust, the marital trust would not be funded. As attorney for the estate, he received copies of the monthly statements of the investment accounts. The executor of the estate had the authority to act on behalf of the estate with regard to these accounts. Hayes was not aware of the loans to respondent when they occurred, but became aware of them when he prepared an accounting of the estate in response to Nadine's motion in the probate case. By that time, all of the loans had been repaid by respondent. The repayments did not include interest on the amounts borrowed.

¶ 13 Hayes was aware of payments made by respondent on behalf of his mother and sister, but was not aware of any notice to them regarding any loans or payments of estate funds. He also knew of payments made to fund repairs and operating expenses for Marie's, which was losing money, had overdrafts on its checking accounts, and had ceased paying rent. Respondent's transfers for Marie's totaled $339,236.50. Hayes was also aware that respondent had asked one of Hayes's law partners to draft a sales agreement because he intended to sell the business to its manager. Hayes ceased representing the estate when respondent withdrew as executor and was replaced by his sister.

¶ 14 Attorney Theodore Rodes, Jr., who specializes in estate planning and trusts, was called as an opinion witness. After reviewing the will and trust documents, he concluded that neither the documents nor the Illinois Probate Act authorized the respondent to make loans from the estate to himself. As independent executor, respondent was allowed to take appropriate actions with regard to the estate without court approval. However, as a fiduciary, he had a duty of loyalty, a duty to avoid self-dealing, and a duty to protect the interests of the beneficiaries. The duty to avoid self-dealing prohibits one from placing oneself on both sides of a transaction, such as lender and borrower. Rodes believed that these duties should have been clear to the respondent. Absent specific authority in the documents, the loans would have been proper only if authorized by court order or if the beneficiaries had agreed.

¶ 15 Rodes further opined that respondent violated his duties as executor when he made payments on behalf of his mother and sister. Under the will, he was directed to distribute his father's personal property to Lillian, which he did, and then to turn over the residue of the estate to the trust, which he failed to do. Any authority that the trustee might have had to make distributions to himself and his mother and sister did not exist under the terms of the will. Even if respondent had funded the trust, the trust document did not authorize self-dealing by way of loans.

¶ 16 Although he characterized respondent's conduct as "dishonest," Rodes stated that he saw nothing in the records that suggested respondent was aware that his conduct was improper

-4-

or that he attempted to conceal the transactions. Rodes also acknowledged that respondent repaid the amounts, but stated that repayment did not absolve him of the breach of duty.

¶ 17 Nadine testified that she had never seen the will or trust documents, but that she understood that her brother was the executor. She expected him to protect the estate and "make it grow." She understood that she, her mother, and her brother were the beneficiaries of the estate. She did not know that her brother was making loans to himself and would have objected if he had asked her permission. She was aware that her brother used money from the estate to buy their mother a new car, to make contributions to her IRA, and to pay some of the real estate taxes on the building that housed Marie's. She had no objection to these expenditures of estate funds. On the occasions when respondent paid her personal income taxes, she gave permission for him to use estate funds. She did not know if he used estate funds to pay his own taxes. She acknowledged that when Marie's was experiencing shortfalls and overdrafts, she asked respondent to fix the problem but did not know how he did it. She assumed he used money from the estate. Nadine's hiring of an attorney and filing of a petition to terminate independent administration was prompted by her discovery that respondent was negotiating to sell Marie's.

¶ 18 Lillian stated that respondent had informed her that he had taken money from the estate, but he did not ask her permission to do so. She did not tell Nadine that respondent had taken any money. She also denied that respondent had used estate funds to keep Marie's in business.

¶ 19 Respondent stated that he had previously handled client funds and he understood his duty as a fiduciary to segregate client funds from his own property. He acknowledged that he used estate funds for his own purposes, explaining that he believed that he was authorized to do so as a beneficiary. Although he believed that he would have been allowed to retain the funds, he chose to treat the withdrawals as loans and to repay the estate. He testified that the attorney, Hayes, told him that under independent administration, an executor could take whatever actions he was authorized to take and make an accounting when the estate was closed. He stated that Hayes did not tell him he first needed to fund the trusts before he could take the actions he was taking. He was unaware that there was any issue with the loans until he received a letter from the ARDC. He denied any intent to convert estate funds.

¶ 20 Chris Atsaves, vice president of investments at UBS Financial Services, testified that he managed the account into which respondent transferred the estate assets. He was familiar with the history of transactions, including respondent's loans to himself and transfers to Marie's. He understood that the funds advanced to Marie's would be repaid to the estate from the proceeds of the eventual sale of the business. While respondent did not sign notes or specify interest rates or terms of repayment when he transferred money to his personal or law office accounts, Atsaves understood that these transfers were personal loans. Respondent repaid these amounts. His first repayment was several thousand dollars greater than the amount owed, and Atsaves deemed the overage to represent interest on the loan. Subsequent repayments did not include interest amounts because respondent considered the interest offset by the approximately $100,000 in unpaid rent owed to him as a part owner of the building occupied by Marie's. Atsaves was also aware that respondent used estate funds to open IRAs for himself, his wife, and Nadine; he repaid the funds used for his own IRA and

his wife's, but not for Nadine's.

¶ 21    Anthony Siragusa, another financial professional, testified that he had known respondent for 50 years and that he was named in respondent's will to be executor of his estate. Respondent kept him informed of his actions with regard to his father's estate. Siragusa was aware that respondent was using estate funds to keep Marie's afloat and that he was trying to sell the business as a going concern. Nadine opposed any sale. Siragusa was also aware that respondent was borrowing funds from the estate for his own use. Respondent kept him informed so that if something happened to respondent, Siragusa would make sure that a full accounting was made and any outstanding debt repaid. Although he acknowledged that he had no information on the terms or interest rates of the loans and that he did not hold a promissory note, he was confident that he would have been able, if necessary, to reconstruct the transactions.

¶ 22    The Hearing Board found that the will was the controlling instrument, because the trust was never funded. Further, under the will, respondent had no authority to lend money to himself. Even if the trust had been funded, the terms of the trust did not authorize such loans and, although respondent was authorized to distribute trust funds to himself for certain specified purposes, he did not properly document the transactions. The absence of promissory notes caused the Hearing Board to "question" respondent's characterization of the transactions as loans. Respondent, an attorney, did not seek clarification of his responsibilities from Hayes, the attorney for the estate. Further, his self-dealing was not excused by the fact that he used estate funds to benefit his mother and sister, or by the fact that he repaid the funds he borrowed. Thus, the Hearing Board concluded that respondent breached his fiduciary duty to the estate and its beneficiaries.

¶ 23    The Hearing Board also found that because respondent had no authority under either the will or the Probate Act to lend funds to himself, he committed conversion when he took funds from the estate. The Board concluded that because respondent failed "to follow correct procedures, which failure eventually became the subject of court proceedings," his conduct was prejudicial to the administration of justice in violation of Rule of Professional Conduct 8.4(a)(5) and tended to defeat the administration of justice in violation of Supreme Court Rule 770.

¶ 24    On the issue of dishonesty, the Hearing Board concluded that respondent did not intend to deceive or to defraud the estate or its beneficiaries. He took no affirmative steps to conceal his actions, and he repaid the amounts he borrowed. Indeed, repayment was complete more than a year before his actions were reported to the ARDC. He was unfamiliar with estate administration and did not appreciate the separate roles of the will and trust documents or his separate roles as executor and trustee. Thus, the Hearing Board concluded, he did not violate Rule of Professional Conduct 8.4(a)(4).

¶ 25    The Hearing Board recommended that respondent be suspended from the practice of law for four months.

¶ 26    Both parties appealed to the Review Board. Before the Review Board, the Administrator argued that the Hearing Board erred by finding that respondent did not violate Rule 8.4(a)(4) and by recommending a suspension for four months rather than for one year. Respondent

argued that the Hearing Board erred by finding that he breached his fiduciary duty to the estate and its beneficiaries and by finding that his conduct amounted to conversion. In the alternative, he argued that the appropriate discipline would be reprimand or censure.

¶ 27    The Review Board concluded that in the absence of an attorney-client relationship between respondent and the estate or its beneficiaries, the charges of breach of fiduciary duty and conversion could not serve as the basis for professional discipline in this case.

¶ 28    As a general matter, the Review Board discouraged the Administrator's use of breach of fiduciary duty as a free-standing charge, absent an allegation of violation of a specific Rule of Professional Conduct. The Board noted that breach of fiduciary duty is not one of the specifically enumerated forms of misconduct in the Rules and that as a general concept of tort liability, it encompasses a wide variety of behavior, not all of which should be the basis for professional discipline. Because the fiduciary duty in this case did not arise from an attorney-client relationship and did not violate a specific Rule, the Review Board stated that the charge had no basis "in law," that is, in the Rules of Professional Conduct.

¶ 29    Similarly, the Review Board stated that the only Rule of Professional Conduct that would specifically encompass conversion is Rule 1.15, which provides that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." Ill. R. Prof. Conduct R. 1.15(a) (eff. Oct. 21, 2009). Again, the Review Board concluded that, absent an attorney-client relationship, respondent could not have violated this rule because he did not "hold" the estate funds for a client or in connection with a representation.

¶ 30    Further, if the tort of conversion, as opposed to a violation of Rule 1.15, were to be the basis of professional discipline, the Review Board stated that the Administrator should be required to prove the elements of the tort by clear and convincing evidence, which was not done in this case. *In re Storment*, 203 Ill. 2d 378, 390 (2002) ("In attorney disciplinary proceedings, misconduct must be proved by clear and convincing evidence."). The Board criticized the suggestion that an attorney could be disciplined for the wrongful deprivation of another's property, without proof of the other elements of the tort. In addition, the Board observed, one cannot convert money unless it is tangible, such as currency taken from a briefcase or a safe-deposit box. For this proposition, the Board cited *Sandy Creek Condominium Ass'n v. Stolt & Egner, Inc.*, 267 Ill. App. 3d 291, 294 (1994) ("Money may be the subject of conversion if the sum of money is capable of being described as a specific chattel. [Citation.] However, an action for the conversion of funds may not be maintained to satisfy an obligation to pay an indeterminate sum of money. If such is the case, the cause of action lies in debt, rather than conversion."). *Sandy Creek*, in turn, cites this court's opinion in *In re Thebus*, 108 Ill. 2d 255, 260 (1985) ("It is ordinarily held, however, that an action for conversion lies only for personal property which is tangible, or at least represented by or connected with something tangible***.' " (quoting 18 Am. Jur. 2d *Conversion* § 9, at 164 (1965))).

¶ 31    The Board concluded that because the Administrator did not plead and prove either a violation of Rule 1.15 or commission of the tort of conversion, the charge of conversion could not stand.

¶ 32    In sum, the Review Board reversed the Hearing Board's decision and recommended that the charges against respondent be dismissed because the Administrator did not prove by clear and convincing evidence that respondent violated the Rules of Professional Conduct when he committed the alleged conversion and breach of fiduciary duty.

¶ 33                                    ANALYSIS

¶ 34    The issues presented in this case are: (1) whether the Administrator met the burden of proving by clear and convincing evidence that respondent's actions with respect to his father's estate constituted a breach of fiduciary duty or conversion; and (2) if so, whether his actions are professional misconduct that may be the basis for the imposition of professional discipline.

¶ 35    The first question requires us to review the factual findings of the Hearing Board under the manifest weight of the evidence standard. *In re Timpone*, 208 Ill. 2d 371, 380 (2004). Respondent argues that he did not breach his fiduciary duty or engage in conversion and that, in any event, these charges were not proven by clear and convincing evidence. The Administrator responds to this argument in its reply brief, arguing that the Hearing Board's findings of facts were correct.

¶ 36    The second question involves interpretation and application of the Rules of Professional Conduct, which we review *de novo. Id.*

¶ 37                          Factual Findings of Hearing Board
¶ 38                              *Breach of Fiduciary Duty*

¶ 39    The Hearing Board found, and respondent does not deny, that he was executor of his father's estate and, as such, "was in a fiduciary position that required him to exercise the highest degree of good faith and fidelity toward the estate and toward its beneficiaries, and to avoid placing his own interests above those of the estate."

¶ 40    The Administrator argues that the Hearing Board's finding of a breach of fiduciary duty was correct because respondent "had no authority under either his father's will or Illinois probate law to lend estate funds to himself yet he lent himself almost $450,000 over the course of five years."

¶ 41    Respondent argues that because the will provided for independent administration of the estate under section 28-1 of the Probate Act of 1975 (755 ILCS 5/28-1 (West 2010)), he was authorized to act without court approval. Further, he asserts that under section 28-10 of the Act, which provides that "the independent representative may at any time or times distribute the estate to the persons entitled thereto" (755 ILCS 5/28-10 (West 2010)), he was entitled to make loans to himself because he would have been entitled to distribute a portion of the estate to himself, without court approval or notice to other beneficiaries. Respondent also relies on the language of the trust document, which authorized the trustee to "make loans to the fiduciary of any trust created by me or any member of my family *** even though the trustee is such a fiduciary." He states that this language gave him the authority to make loans of trust funds to himself without notice or approval. Thus, respondent's argument concludes

that the Administrator failed to prove a breach of fiduciary duty by clear and convincing evidence.

¶ 42    The rules governing the fiduciary duty of an executor are well-settled. "[T]he beneficiaries of an estate are intended to benefit from the estate and are owed a fiduciary duty by the executor to act with due care to protect their interests." *Gagliardo v. Caffrey*, 344 Ill. App. 3d 219, 228 (2003). The executor's duty is to "carry out the wishes of the decedent," acting in the utmost good faith to protect the interests of the beneficiaries, "exercising at the very least that degree of skill and diligence any reasonably prudent person would devote to [his] own personal affairs." *Will v. Northwestern University*, 378 Ill. App. 3d 280, 291-92 (2007). Ultimately, the executor's duty is to administer the assets of the estate so that any debts or obligations are paid and the beneficiaries receive their just and proper benefits " 'in an orderly and expeditious manner.' " *Id.* (quoting *In re Estate of Greenberg*, 15 Ill. App. 2d 414, 424 (1957)). In addition, an executor owes a duty of full disclosure to the beneficiaries under the testator's will. See *In re Estate of Talty*, 376 Ill. App. 3d 1082, 1089 (2007).

¶ 43    The father's will named two beneficiaries: his wife, Lillian, and the unfunded trust. As executor of his father's will, respondent was required to distribute his father's personal property to Lillian and to transfer all other estate assets to the trust. Then, in his role as trustee, he was required to create two separate trusts. He did not transfer the residue of the estate to the trust, as evinced by the fact that the checks he drew on the account at USB Financial Services continued to list the "Estate of George Karavidas" as the account holder. Thus, the Hearing Board was correct in concluding that because the assets were never transferred to the trust, the will is the controlling instrument with respect to the transactions at issue.

¶ 44    We also agree with the Hearing Board that although the will authorized independent administration, neither the will itself nor the independent administration provision of the Probate Act (755 ILCS 5/28-1 (West 2010)), authorized respondent, as executor, to make loans to himself or to use the estate assets as a line of credit for his own benefit. Section 28-1 of the Probate Act permits an executor to act on behalf of the estate without court approval; it does not permit him to ignore the intent of the testator. The will gave the executor the power to borrow money, not to lend it. It allowed the executor to "deal with" himself in his other role as trustee, but not to engage in transactions with himself as an individual. The provision allowing him to make distributions from the estate permitted such distributions only to the named beneficiaries of the will—Lillian and the trust—not to the eventual beneficiaries of the trust.

¶ 45    The facts of this case are similar to *Prignano v. Prignano*, 405 Ill. App. 3d 801, 811-12 (2010), where the executor of the estate, who was brother of the testator and co-owner of several businesses, breached his fiduciary duty to carry out the express provisions of the will. The will provided that the executor was to receive his late brother's share of the "assets" of a corporation owned by the brothers. In addition to the assets of the business, the executor distributed to himself his late brother's share of the stock in the corporation. The appellate court held that shares of stock are not assets of a corporation; rather, they are units of ownership in the corporation. As such, the stock was part of the residue of the estate, which was to be distributed to the testator's widow and their two minor children. Thus, the executor

-9-

"breached his fiduciary duty as executor to carry out the express provisions of the will." *Id.* at 811. In addition, because the children's share of the residue was to be placed in trust for them, the executor also breached his fiduciary duty as trustee of the children's trusts "to secure for them the property that should have formed the *res* of their trusts." *Id.* at 812.

¶ 46 Similarly, in the present case, respondent breached his fiduciary duty to carry out the express provisions of the will by failing to transfer estate assets to the trust and by lending estate assets to himself. Even if such loans had been permissible, his failure to document the transactions as loans placed the assets of the estate at risk if he were to die or become incompetent before the loans were repaid.

¶ 47 Respondent also breached his fiduciary duty by failing to disclose the transactions to his mother or sister. In *Estate of Talty*, the testator named as executor his brother, with whom he co-owned an automobile dealership and the real estate on which it was located. The will named the testator's wife as the sole residuary beneficiary, giving the brother the right to purchase the testator's share of the dealership, subject to certain conditions, including an independent appraisal of the value of the dealership. *Estate of Talty*, 376 Ill. App. 3d at 1084. The executor obtained an appraisal that falsely stated the value of the dealership and closed the sale to himself. In ensuing litigation, the circuit court found that although the testator "knowingly waived any conflict of interest" when he appointed his brother and business co-owner as his executor, the executor nevertheless acted in bad faith. *Id.* at 1086. The appellate court affirmed, stating that the testator had waived any conflict of interest by placing his brother in "multiple capacities as buyer, seller, and fiduciary." Further, the court observed that "an executor can serve potentially conflicting interests without exercising bad faith as a fiduciary." *Id.* at 1089. However, the executor breached his fiduciary duty of full disclosure by failing to disclose to the residuary beneficiary information regarding the appraisals of the business and the real estate and the closing dates for the sales. *Id.* at 1089-90.

¶ 48 The elder Karavidas named his son as executor and successor trustee, knowing that his son was also a beneficiary of the trust. Thus, as in *Talty*, he waived any conflict of interest by placing respondent in multiple capacities as executor, trustee, and beneficiary. However, such a waiver does not relieve the respondent of an executor's fiduciary duty of full disclosure. The record clearly demonstrates that respondent did not inform his mother, who was a beneficiary under the will and trust, of his repeated taking of loans from the estate. He also failed to disclose the transactions to his sister, who, while not a direct beneficiary of the will, was an intended beneficiary of the trust that he failed to fund with estate assets.

¶ 49 Respondent argues that his position is supported by the case of *In re* Nagler, M.R. 23644 (May 17, 2010), in which the respondent attorney, who drafted a will and trust for his father and served as executor of his father's estate, failed to follow the directions in the will. He did not set up separate trusts for himself and his sister as instructed, but rather allowed all of the funds to remain in one trust account, keeping a mental note of the amount to which each was entitled and making sure that he did not distribute more than one half of the funds to himself. He also made a loan of trust funds to a friend, without informing his sister of the transaction. Although he was found to have committed other forms of misconduct, Nagler was not found to have breached his fiduciary duty. Respondent argues that his conduct was less egregious than the conduct charged in *In re* Nagler and, thus, he should be found not to have breached

his fiduciary duty.

¶ 50    The Hearing Board considered and rejected this argument, noting the significant distinction between respondent and Nagler. In contrast to Nagler, respondent was acting as executor of his father's estate, not as a trustee. An executor has a duty of full disclosure. *Estate of Talty*, 376 Ill. App. 3d at 1089-90. Further, although Nagler failed to separate the residuary trust into two separate trusts, he was operating under the terms and conditions of his father's trust document, which gave broad discretion to the trustee. In the present case, respondent was operating under the terms of his father's will, which did not permit him to make loans to himself.

¶ 51    Although the will was the operative instrument, respondent nevertheless relies on the trust document to argue that he was entitled to distribute trust assets to himself and that, therefore, he cannot have breached his fiduciary duty by taking the same funds directly from the probate estate. We reject the implicit suggestion that the funding of the trust was a mere formality that could be dispensed with. Further, although respondent as trustee did have the authority to make distributions of trust funds to himself, that authority was not unlimited. During his mother's lifetime, he was authorized to distribute trust funds to himself and his sister only for their "health, support and education" and only after consideration of their "other resources." Additionally, as trustee, he was required to give "primary consideration" to his mother's needs. Thus, even if he had funded the trust, he was not authorized to use the trust as his personal line of credit.

¶ 52    Respondent's explanation that he at no time owed the estate more than one-third of its total original value is not persuasive. Even had he carried out his father's wishes, he was not entitled to one-third of the estate. Rather, he would have eventually received one-half of the remaining principal in the family trust upon the death of his mother, provided that she did not exercise her testamentary power of appointment to reduce his share. Indeed, it was entirely possible that the care and support of his mother would consume the entire corpus of the family trust.

¶ 53    We acknowledge respondent's assertion that he also made payments of estate funds to or on behalf of his mother and sister. While these payments do tend to support his claim that he was not acting to defraud the estate, but simply did not understand his obligations as executor, these transactions do not negate his breach of fiduciary duty. Indeed, they, too, were breaches of fiduciary duty because they were unauthorized by the will.

¶ 54    Had respondent followed the instructions in his father's will, the estate could have been closed in a timely manner. Instead, he allowed the assets to remain in the probate estate for over five years and engaged in numerous undocumented transactions, some of which benefitted his mother and sister and some of which benefitted himself. He did so without disclosing the transactions to the other intended beneficiaries and without their consent. We find, therefore, that the Hearing Board's finding that respondent breached his fiduciary duty as executor of his father's estate was not against the manifest weight of the evidence.

¶ 55                                    *Conversion*

¶ 56    The same conduct that was alleged to constitute a breach of fiduciary duty—respondent's

unauthorized taking of estate funds in the form of undocumented loans for his personal use—was also alleged to constitute conversion. In effect, the respondent was charged with breaching his fiduciary duty by means of converting estate funds. The Hearing Board concluded that his conduct met the definition of conversion.

¶ 57    Respondent argues that he did not engage in conversion because he was entitled to use all or part of the estate funds and that his mother and sister were not deprived of anything to which they were entitled because they had no greater right to the funds than he did. He acknowledges that he borrowed the funds from the estate, rather than creating the trusts and then disbursing funds to himself as a beneficiary of the family trust, but insists that no conversion took place when he would have been allowed to use the funds if they had been placed in the family trust. He asserts that the Administrator failed to prove any of the elements of the common law tort of conversion and that the Review Board correctly found that he did not convert estate funds.

¶ 58    The Administrator responds that respondent cites no authority for his assertion that he was entitled to use the estate funds or that his actions, particularly the utter lack of documentation for the loans, would have been permitted if the trust had been funded. Thus, his taking of the funds, even with subsequent repayment, was conversion.

¶ 59    At common law, conversion is the "wrongful possession or disposition of another's property as if it were one's own; an act or series of acts or willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." Black's Law Dictionary 381 (9th ed. 2009).

¶ 60    "This court has stated that '[a] conversion is any unauthorized act, which deprives a man of his property permanently or for an indefinite time ***.' (*Union Stock Yard & Transit Co. v. Mallory, Son & Zimmerman Co.* (1895), 157 Ill. 554, 563.) In *Bender v. Consolidated Mink Ranch, Inc.* (1982), 110 Ill. App. 3d 207, 213, the court said, 'The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held.' In *Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 932, it was stated: 'One claiming conversion must show a tortious conversion of the chattel, a right to property in it, and a right to immediate possession which is absolute ***.' In *Farns Associates, Inc. v. Sternback* (1979), 77 Ill. App. 3d 249, 252, the court said, 'The essence of an action for conversion is the wrongful deprivation of property from the person entitled to possession.' " *Thebus*, 108 Ill. 2d at 259-60.

¶ 61    In the context of a civil case, " '[t]o prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property.' " *Loman v. Freeman*, 229 Ill. 2d 104, 127 (2008) (quoting *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114 (1998)).

¶ 62    However, when conversion is charged as a form of professional misconduct, it has a more "specialized meaning." *Thebus*, 108 Ill. 2d at 259. Thus, the general rules as to the elements of the tort may be altered to fit the requirements of the Rules of Professional

-12-

Responsibility. See *id.* at 261. For example, an attorney may be found to have committed conversion when the balance in an account in which client funds are being held falls below the amount then belonging to clients. *In re Cheronis*, 114 Ill. 2d 527, 534-35 (1986). This is true even though no client entitled to the funds has made a demand for possession. Thus, in *In re* Lasica, No. 07-CH-125 (Review Board Jan. 22, 2010), the Review Board rejected the attorney's argument that demand for possession is a necessary element of conversion in a disciplinary proceeding, observing that "[a]ttorneys are not free to use funds that they hold on behalf of a client or third party until such time as a demand for possession is made."

¶ 63 In the context of a disciplinary proceeding where an attorney-client relationship is involved, we use the term "conversion" as a term of art and focus on the attorney's conduct with respect to the property or funds of the client or third party, not on the circumstances that would be necessary to give rise to a claim in tort by the rightful owner. See *In re Rosin*, 156 Ill. 2d 202, 206 (1993) (defining conversion in the context of a disciplinary proceeding as "any unauthorized act, which deprives a man of his property permanently or for an indefinite time," where the property at issue was the client's share of proceeds of a settlement (internal quotation marks omitted)). Thus, when an attorney is acting as an attorney, he may be found to have converted funds that are held in a trust account holding funds owed to numerous clients, even though his misconduct does not fit the common law definition of conversion.

¶ 64 As the Review Board correctly noted, respondent's conduct did not violate Rule 1.15(a) because the funds involved were neither client funds nor funds held by respondent for a third person "in connection with a representation." Ill. R. Prof. Conduct R. 1.15(a) (eff. Oct. 21, 2009). Thus, our term of art does not apply.

¶ 65 This raises the additional consideration that, at common law, not all types of property are subject to being converted. See *Thebus*, 108 Ill. 2d at 260 (" 'It is ordinarily held, however, that an action for conversion lies only for personal property which is tangible, or at least represented by or connected with something tangible ***.' " (quoting 18 Am. Jur. 2d *Conversion* § 9, at 164 (1965))). Thus, if the nonattorney executor of an estate were to help himself to a valuable painting or piece of jewelry, he would not only be in breach of his fiduciary duty, he would be liable in tort for conversion. However, the Review Board observed that the funds that respondent "borrowed" from the estate were not "capable of being described as a specific chattel" and, thus, were not capable of being converted.

¶ 66 As established above in our discussion of breach of fiduciary duty, respondent's actions were indeed wrongful and without authorization. In addition, he deprived the estate and its intended beneficiary, the trust, of the funds for an indefinite period of time. Because we have already found that respondent's conduct with respect to the estate funds was a breach of fiduciary duty, we need not determine whether the means by which the breach was committed may also be labeled as common law conversion.

¶ 67 We briefly address the argument, made for the first time at oral argument, that respondent could not have committed conversion of funds from the estate or breached his fiduciary duty because the death of George Karavidas "funded" the George Karavidas Trust and that the trust document allowed the trustee to make loans.

¶ 68 The Administrator rightly points out that this is a change in the respondent's position

before the Hearing Board and should not be given any consideration. We also note that the assertion that estate assets somehow automatically become trust principal upon the death of a testator who has created an unfunded trust that is to be funded via a pour-over will is unsupported by any citation to authority. Further, respondent's claim is contradicted by the fact that the investment accounts continued to be held in the name of the "Estate of George Karavidas," not in the name of the trust.

¶ 69    The finding of the Hearing Board that respondent breached his fiduciary duty is not against the manifest weight of the evidence. We decline to determine whether his conduct might also be labeled as conversion. The question remains whether this civil offense—for which a civil remedy is available to aggrieved parties—is a proper basis for professional discipline in this case.

¶ 70                     Alleged Violations of Rules of Professional Conduct

¶ 71    The complaint states that respondent converted estate funds and breached his fiduciary duty and that he violated Rules 8.4(a)(4) and 8.4(a)(5) of the Illinois Rules of Professional Conduct and Supreme Court Rule 770. These charges are enumerated (1) through (5). This is the Administrator's standard way of stating charges, but it is not entirely clear whether the respondent was being charged with five separate types of misconduct, or he was being charged with violating three separate rules by committing two types of misconduct, which were, in turn, based on a single act.

¶ 72    We urge the Administrator to ensure that a complaint clearly and unambiguously inform a respondent of the specific acts with which he is charged and the specific rules that he is alleged to have violated by engaging in those acts.

¶ 73    Supreme Court Rule 753(b) provides that a disciplinary complaint "shall reasonably inform the attorney of the acts of misconduct he is alleged to have committed." Ill. S. Ct. R. 753(b) (eff. Sept. 1, 2006). An accused attorney's procedural due process rights, including the right to fair notice and the right to an opportunity to defend against all charges, would be violated if an attorney were disciplined for uncharged misconduct. *In re Chandler*, 161 Ill. 2d 459, 470 (1994). When an attorney is accused of engaging in certain conduct, but that accusation is not tethered to an alleged violation of a specific Rule of Professional Conduct, it creates the risk that discipline might be imposed for conduct that does not violate professional norms.

¶ 74    For example, in *In re Mulroe*, 2011 IL 111378, the respondent attorney represented a friend in a dissolution proceeding, a matter outside his usual areas of practice. He agreed to hold the proceeds from the sale of the couple's home until the allocation was determined by the court. *Id.* ¶ 7. The Hearing Board found that he converted client funds in violation of Rules 1.15(a) and (b) by failing to hold the escrow funds separate from his own property and to promptly deliver the funds upon demand by the rightful owner. In addition, he violated Rule 8.4(a)(5) by engaging in conduct that was prejudicial to the administration of justice and that brought the legal profession into disrepute. *Id.* ¶ 12. However, the Hearing Board found that the Administrator did not prove a violation of Rule 8.4(a)(4) by clear and convincing evidence where the conversion "was a technical one, not motivated by an

intention to deprive" the rightful owner of the funds. *Id.* The attorney had the financial means to deliver the funds at all relevant times and honestly believed that he was not to distribute the funds to the ex-wife until the issues on appeal were resolved. *Id.*

¶ 75　This court rejected the Administrator's argument that recklessness in the handling of client funds is sufficient to satisfy the *scienter* requirement of Rule 8.4(a)(4). *Id.* ¶ 19. While we acknowledged that the holding of client funds "is a serious fiduciary duty and should not be treated lightly," we determined that "the question at hand is not whether respondent committed conversion, but whether the conversion constituted 'conduct involving dishonesty, fraud, deceit, or misrepresentation' such that respondent violated Rule 8.4(a)(4)." *Id.* ¶ 20. We declined to adopt a bright-line rule that reckless conversion creates a presumption of dishonesty. *Id.* ¶ 23. We also concluded that the Hearing Board's finding of no dishonest intent behind the conversion was not against the manifest weight of the evidence. *Id.* ¶ 31. Thus, there was no violation of Rule 8.4(a)(4), despite the conversion.

¶ 76　In contrast, in *In re Merriwether*, 138 Ill. 2d 191 (1990), the respondent attorney negotiated a settlement on behalf of a client in a personal injury case. The client's medical expenses had been paid by the Illinois Department of Public Aid, which, thus, had a lien on the settlement proceeds. He remitted to the client the funds to which she was entitled, but despite repeated demands by the Department, failed to remit the amount due under the lien. *Id.* at 194-96. The attorney admitted that he used the money for personal purposes because he was in a "financial predicament." *Id.* at 198. As a result, the balance in his client trust account fell below the amount of the lien. *Id.* at 197. This commingling and conversion of funds involved "client money," but it did not involve money owed to the client; rather, it involved funds owed to a state agency to reimburse it for funds expended on the client's behalf. *Id.* at 200. The Hearing Board found violations of numerous provisions of the Code of Professional Responsibility. (The Code of Professional Responsibility was replaced in 1990 by the Rules of Professional Conduct.)

¶ 77　This court found that the attorney's conduct resulted in his client's becoming subject of a body attachment order and a contempt proceeding when the Department, not knowing that the attorney retained a portion of the settlement amount, attempted to collect the funds owed from the client. This conduct violated the Code by inconveniencing the client. *Id.* at 200-01. See Ill. S. Ct. Code of Prof. Res. R. 7-101(a)(3) (eff. July 1, 1980) (prohibiting conduct that may damage or prejudice a client). In addition, the attorney also violated the Code by acting dishonestly in his dealings with the Department and by attempting to conceal his misdeeds. *Merriwether*, 138 Ill. 2d at 201. See Ill. S. Ct. Code of Prof. Res. R. 1-102(a)(4) (eff. July 1, 1980) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation). Thus, it was not the conversion *per se* that constituted professional misconduct. It was the violations of several provisions of the Code of Professional Conduct. Conversion was the means of committing the violations.

¶ 78　*Mulroe* and *Merriwether* support the proposition that an attorney's breach of fiduciary duty or conversion does not, standing alone, warrant the imposition of professional discipline. As the Review Board noted in the present case, discipline for conduct occurring outside the attorney-client relationship should be limited to situations where the attorney's conduct violates the Rules by demonstrating "a lack of professional or personal honesty

which render[s] him unworthy of public confidence." *In re* Bruckner, No. 00-CH-12, at 30 (Hearing Board Aug. 8, 2001), approved and confirmed M.R. 17722 (Nov. 28, 2001).

¶ 79    In sum, we hold that professional discipline may be imposed only upon a showing by clear and convincing evidence that the respondent attorney has violated one or more of the Rules of Professional Conduct. Mere bad behavior that does not violate one of the Rules is insufficient.

¶ 80                                *Supreme Court Rule 770*

¶ 81    The Hearing Board concluded that respondent's conversion of estate funds "tended to defeat the administration of justice in violation of Supreme Court Rule 771." (Effective April 1, 2004, a new Rule 771 was adopted and the former Rule 771, to which the Hearing Board was referring, was renumbered as Rule 770.)

¶ 82    The Administrator argues that Rule 770 specifically provides that "attorneys may be disciplined for conduct that does not violate the Rules of Professional Conduct." This argument focuses on the use of the word "or" in Rule 770 to argue that discipline may be imposed on an attorney *either* for violating the Rules *or* for engaging in conduct that does not violate the Rules, but that defeats the administration of justice or tends to bring the courts or the profession into disrepute.

¶ 83    We begin our analysis by noting that Rule 770 is a procedural rule of this court, not a Rule of Professional Conduct. As we noted in *In re Thomas*, 2012 IL 113035, ¶ 92:

> "Supreme Court Rule 770 is not itself a Rule of Professional Conduct. Rather, it is contained in article VII, part B, of our rules, which governs 'Registration and Discipline of Attorneys.' Rule 770 is titled 'Types of Discipline' and provides that '[c]onduct of attorneys which violates the Rules of Professional Conduct contained in Article VIII of these rules or which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute shall be grounds for discipline by the court.' [Citation.] The rule then lists eight levels of discipline ranging from disbarment to reprimand. Thus, one does not 'violate' Rule 770. Rather, one becomes subject to discipline pursuant to Rule 770 upon proof of certain misconduct."

¶ 84    We do not attach the significance to the word "or" that the Administrator suggests. Aside from the placement of Rule 770 in article VII of our court rules, which signifies the procedural nature of the rule, the Rules of Professional Conduct are sufficiently broad to encompass conduct that defeats the administration of justice. Indeed, Rule 8.4(a)(5) prohibits conduct that is "prejudicial" to the administration of justice. Ill. R. Prof. Conduct R. 8.4(a)(5) (eff. July 6, 2001). Further, one may bring the courts or the legal profession into disrepute by violating any of the Rules. However, attorney conduct that does not violate any of the Rules may not be the basis for professional discipline.

¶ 85    In the past, we have referred to Rule 770 and its predecessor Rule 771 as if they were Rules of Professional Conduct. For example, in *In re Winthrop*, we stated that the respondent attorney, who made a false statement of material fact to opposing counsel, "violated both" Rule of Professional Conduct 8.4(a)(4) and Supreme Court Rule 771. *In re Winthrop*, 219

Ill. 2d 526, 558 (2006). A more precise statement would have been that he violated Rule 8.4(a)(4) by making the false statement and, thus, was subject to discipline pursuant to Rule 771.

¶ 86    We reiterate: by definition, violation of any of the Rules of Professional Conduct may tend to defeat the administration of justice, to bring the courts or the profession into disrepute, or both. If an attorney is proven to have violated the Rules of Professional Conduct, he is then subject to discipline under Supreme Court Rule 770. Rule 770 cannot support a separate charge against an attorney because it is not a Rule of Professional Conduct; it governs the types of discipline that may be imposed upon a showing of a violation of a Rule.

¶ 87                    *Rule of Professional Conduct 8.4(a)(5)*

¶ 88    Respondent was charged with violating Rule 8.4(a)(5), which at the relevant time enumerated nine types of professional misconduct. In pertinent part:

"A lawyer shall not:

* * *

(3) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(4) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(5) engage in conduct that is prejudicial to the administration of justice[.]" Ill. R. Prof. Conduct R. 8.4(a) (eff. July 6, 2001).

¶ 89    Depending on the facts of the case, an attorney's breach of fiduciary duty might involve criminal conduct, which could subject the attorney to discipline under subsection (3), or it could involve dishonesty, fraud, deceit, or misrepresentation, subjecting him to discipline under subsection (4). In the present case, the Administrator charged respondent with violating subsection (5).

¶ 90    The Hearing Board stated that respondent's failure to properly document the loans was prejudicial to the administration of justice in violation of Rule 8.4(a)(5) because his failure to properly document the loans "eventually became the subject of court proceedings."

¶ 91    In *In re Vrdolyak*, 137 Ill. 2d 407, 425 (1990), we interpreted this rule as requiring proof of actual prejudice to the administration of justice. Vrdolyak, an attorney who was also a Chicago alderman, operated under a conflict of interest when he represented a client in a dispute with the city. He did not, however, violate Disciplinary Rule 1-102, which forbade engaging in "conduct that is prejudicial to the administration of justice" (Ill. S. Ct. Code of Prof. Res. R. 1-102(a)(5) (eff. July 1, 1980)), because "clear and convincing evidence that the administration of justice was, indeed, prejudiced" was lacking. *Vrdolyak*, 137 Ill. 2d at 425.

¶ 92    Thus, in *In re Storment*, 203 Ill. 2d 378 (2002), we found that the Hearing and Review Boards' conclusion that the respondent attorney had not violated Rule 8.4(a)(5) was not against the manifest weight of the evidence, despite his violation of Rule 1.5(f), which

-17-

required a client's written agreement to an attorney fee-sharing arrangement. The violation of the writing requirement had no impact on the attorney's representation of the client or on the outcome of the case. Thus, the record lacked clear and convincing evidence of any prejudice to the administration of justice. *Id.* at 397-98.

¶ 93    In contrast, in *In re Cutright*, 233 Ill. 2d 474 (2009), the respondent attorney was found to have engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(a)(5) when he neglected an estate of which he was executor, allowing it to remain open for 17 years. *Id.* at 485. The actual prejudice to the administration of justice was that two heirs died before ever receiving their share of the estate and other heirs were forced to wait 17 years before receiving any distribution. *Id.* at 486.

¶ 94    The attorney conduct at issue in *In re Thomas* was also prejudicial to the administration of justice in violation of Rule 8.4(a)(5). The respondent attorney, who had been suspended from practicing law, appeared before the Seventh Circuit to represent a corporation of which he was the president and sole shareholder. We noted that the corporation had filed for bankruptcy and that any recovery that might have been made in the litigation would have been part of the bankruptcy estate. Thus, because the respondent represented only his own interests as a shareholder, and not the interests of the bankrupt corporation's creditors, his conduct did indeed prejudice the administration of justice. *Thomas*, 2012 IL 113035, ¶ 91. This was so even though his conduct did not result in actual harm to the creditors; his conduct undermined the judicial process and, thus, prejudiced the administration of justice.

¶ 95    Attorney Thomas also engaged in conduct that prejudiced the administration of justice by continuing to represent other clients after the date of his suspension. This conduct placed the interests of his clients in jeopardy because his unauthorized practice of law could have resulted in a default judgment for the opposing party. *Id.* ¶ 123.

¶ 96    In the present case, the Hearing Board concluded that respondent's sister's filing of a motion in the probate case implicated the judicial process, so that respondent's conduct was prejudicial to the administration of justice. However, the record reveals no conduct by respondent regarding the motion to terminate independent administration or the later motion to replace him as executor that could have undermined the judicial process. The loans were made and repaid in full before her papers were filed. His breach of fiduciary duty, while not acceptable conduct for any executor, had no actual or potential effect on the administration of justice.

¶ 97    We, therefore, agree with the Review Board that respondent's conduct, because he was not acting as an attorney and he was not involved in the judicial process at the time of the breach, did not undermine the administration of justice. While an attorney's breach of fiduciary duty owed to a nonclient could constitute an act that is prejudicial to the administration of justice, this did not occur in this case. Further, if an attorney is to be disciplined for such conduct, the Administrator must, as a matter of due process, plead and prove that the breach of fiduciary duty had a prejudicial effect on the administration of justice. To the extent that our earlier decisions state or imply otherwise, they are hereby overruled.

¶ 98                         *Rule of Professional Conduct 8.4(a)(4)*

¶ 99        Rule 8.4(a) lists nine separate acts that constitute misconduct. The Administrator charged respondent with violating Rule 8.4(a)(4), engaging in "conduct involving dishonesty, fraud, deceit, or misrepresentation." The Hearing Board found no violation of this rule despite respondent's breach of his fiduciary duty. We agree.

¶ 100       Under the manifest weight of the evidence standard of review, we give deference to the factual findings of the Hearing Board, because the Hearing Board is in a position to observe the witnesses' demeanor, judge their credibility, and resolve conflicting testimony. *Timpone*, 208 Ill. 2d at 380.

¶ 101       We see no reason in the present case to reject the Hearing Board's findings. The record suggests that respondent did not fully understand his obligations as executor and trustee, not having practiced in this area, and that he may have been given confusing legal advice (or the questions he posed to his legal advisor were not sufficiently detailed to elicit correct advice). Whatever the case, there is no suggestion that he acted to deceive or to defraud; at most, he was careless in his duties.


¶ 102                                    CONCLUSION

¶ 103       In sum, before professional discipline may be imposed under Supreme Court Rule 770, the Administrator must demonstrate that the attorney violated the Rules of Professional Conduct. To the extent that any of our prior cases suggest that an attorney may be subjected to professional discipline for conduct that is not prohibited by the Rules of Professional Conduct or defined as misconduct therein, we hereby reject such a suggestion. As a matter of due process, an attorney who is charged with misconduct and faces potential discipline must be given adequate notice of the charges, including the rule or rules he is accused of violating. Personal misconduct that falls outside the scope of the Rules of Professional Conduct may be the basis for civil liability or other adverse consequences, but will not result in professional discipline. We, therefore, accept the recommendations of the Review Board and dismiss the charges against respondent.


¶ 104       Charges dismissed.


¶ 105       JUSTICE THOMAS, dissenting:

¶ 106       The majority holds that, although respondent breached his fiduciary duty in no less than four distinct ways while serving as the executor of his late father's $700,000 estate, he nevertheless is immune from professional discipline because none of his misconduct violated a specific Rule of Professional Conduct. According to the majority, "before professional discipline may be imposed under Supreme Court Rule 770, the Administrator must demonstrate that the attorney violated the Rules of Professional Conduct." *Supra* ¶ 103. By way of corollary, the majority then adds that, "[t]o the extent that any of our prior cases suggest that an attorney may be subjected to professional discipline for conduct that is not prohibited by the Rules of Professional Conduct or defined as misconduct therein, we hereby

reject such a suggestion." *Supra* ¶ 103.

¶ 107    The problem with the majority's reasoning is that this court has not merely *suggested* that an attorney may be subjected to professional discipline for conduct that is not specifically prohibited by the Rules of Professional Conduct. On the contrary, this court has *expressly held as much*. In *In re Rinella*, 175 Ill. 2d 504 (1997), this court began its analysis by "reject[ing] respondent's contention that attorney misconduct is sanctionable only when it is specifically proscribed by a disciplinary rule." *Id.* at 514. In doing so, this court explained that "the standards of professional conduct enunciated by this court are not a manual designed to instruct attorneys what to do in every conceivable situation." *Id.*

¶ 108    Quite notably, the foregoing portion of *Rinella* is not, as the majority would have us believe, anchored in an imprecise reading of Rule 770 (then Rule 771). In fact, this portion of *Rinella* is not anchored in Rule 770 at all. Rather, *Rinella* is simply an articulation of this court's understanding of its own rules. And as *Rinella* points out, that understanding was memorialized in the 1990 preamble to the Rules of Professional Conduct themselves, which states in relevant part:

> " 'Violation of these rules is grounds for discipline. No set of prohibitions, however, can adequately articulate the positive values or goals sought to be advanced by those prohibitions. This preamble therefore seeks to articulate those values ***. Lawyers seeking to conform their conduct to the requirements of these rules should look to the values described in this preamble for guidance in interpreting the difficult issues which may arise under the rules.' " *Id.* at 514-15 (quoting Ill. R. Prof. Conduct, Preamble).

According to *Rinella*, "[t]he preamble *** likens the practice of law to a public trust, and charges lawyers with maintaining public confidence in the system of justice by acting competently and with loyalty to the best interests of their clients." *Id.* at 515. Consequently, *Rinella* explained, it is appropriate to look not just to the specific language of the Rules themselves but also to the principles set forth in the preamble in determining whether an attorney's conduct is sanctionable. *Id.* at 514-15.

¶ 109    Although it is nowhere mentioned by the majority, *Rinella* is of paramount importance in this case. Indeed, once *Rinella* is taken into account, the majority's reading of Rule 770 becomes untenable. Again, Rule 770 provides, in relevant part:

> "Conduct of attorneys which violates the Rules of Professional Conduct contained in article VIII of these rules or which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute shall be grounds for discipline by the court." Ill. S. Ct. R. 770 (eff. Apr. 1, 2004).

Now on its face, this language would seem to state very plainly that there are two categories of conduct for which an attorney may be disciplined by the court: (1) conduct "which violates the Rules of Professional Conduct contained in article VIII of these rules," and (2) conduct "which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute." Indeed, such a reading is compelled by numerous well-settled canons of construction, not the least of which are that clear and unambiguous language must be enforced as written (*Hines v. Department of Public Aid*, 221 Ill. 2d 222, 230 (2006)) and

that a statute or rule should be construed, wherever possible, such that no word, clause, or sentence is rendered meaningless or superfluous (*People v. Jones*, 168 Ill. 2d 367, 375 (1995)).

¶ 110　　Yet the majority's reading of Rule 770 turns both of these canons on their heads. According to the majority, though Rule 770 clearly identifies two distinct categories of conduct for which an attorney may be disciplined by the court (conduct that violates a rule and conduct that tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute), in fact, Rule 770 identifies only one category (conduct that violates a rule). This reading renders the phrase "or which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute" entirely meaningless. Indeed, if the majority's reading of Rule 770 is correct, what possible reason is there for the inclusion of that phrase in the rule? The fact is, the majority's reading of Rule 770 is not driven by the plain language of that rule but rather by the majority's conviction that due process prohibits an attorney from being "subjected to professional discipline for conduct that is not prohibited by the Rules of Professional Conduct or defined as misconduct therein." *Supra* ¶ 103. But this is the very argument we rejected outright in *Rinella*. See *Rinella*, 175 Ill. 2d at 514 (rejecting respondent's argument that "imposing *** sanction[s] under these circumstances would violate due process because [respondent] did not have adequate notice that his conduct was prohibited"). In other words, the majority's entire reading of Rule 770 stems from a false premise.[1]

¶ 111　　Once *Rinella*'s holding is taken into account, Rule 770 makes perfect sense on its face, and it becomes easy to give full effect to every one of its words, rather than to only half of them. Again, *Rinella* makes crystal clear both that "the standards of professional conduct enunciated by this court are not a manual designed to instruct attorneys what to do in every conceivable situation" and that attorneys *may* be sanctioned for engaging in misconduct that is not "specifically proscribed by a disciplinary rule." In light of this holding, it should come as no surprise that Rule 770, which authorizes the imposition of discipline for attorney misconduct, authorizes it both for "[c]onduct of attorneys which violates the Rules of Professional Conduct" and for conduct that "tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute." Indeed, Rule 770 reflects and enables the very policy that the court articulated in *Rinella*. The two go hand-in-hand.

¶ 112　　Now I recognize that, in 2010, the Rules of Professional Conduct were overhauled and that, with the overhaul, came a whole new preamble. This is of no consequence, however, for at least two reasons. First, all of respondent's conduct in this case occurred *prior to* the

---

[1]The majority cites this court's recent statement from *In re Thomas* that "one does not 'violate' Rule 770. Rather, one becomes subject to discipline pursuant to Rule 770 upon proof of certain misconduct." *Supra* ¶ 83 (quoting *In re Thomas*, 2012 IL 113035, ¶ 92). Of course, this statement does not settle the question at hand; it raises it: What "certain misconduct" subjects one to discipline pursuant to 770? I believe that question is answered clearly both in *Rinella* and in Rule 770 itself: conduct which violates the Rules of Professional Conduct and conduct that, though not violating a specific Rule of Professional Conduct, tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute.

2010 overhaul, which means that at all relevant times respondent was operating under the very rules (and preamble) that the court construed in *Rinella*. But even if that were not the case, the preamble enacted in 2010 continues to reflect this court's belief that "the standards of professional conduct enunciated by this court are not a manual designed to instruct attorneys what to do in every conceivable situation." *Rinella*, 175 Ill. 2d at 514. Indeed, paragraph 16 of the 2010 preamble expressly states that the rules "do not *** exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules." Ill. R. Prof. Conduct (2010), Preamble, ¶ 16 (eff. Jan. 1, 2010). Thus, there is absolutely no reason to believe this court's understanding of its rules has in any way changed since *Rinella*.

¶ 113    In sum, I am convinced that, contrary to the majority's conclusion, an attorney absolutely may be disciplined for misconduct that is not specifically set forth in our Rules of Professional Conduct. That was this court's express holding in *Rinella*, and it is a policy clearly reflected in the plain language of Rule 770.

¶ 114    The next question is whether respondent's conduct in this case justifies the imposition of professional discipline. I am convinced that it does. Again, this court has expressly held that an attorney may be subject to professional discipline for misconduct that is not specifically proscribed by a disciplinary rule, and Rule 770 authorizes the imposition of discipline for "[c]onduct of attorneys which *** tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute." Ill. S. Ct. R. 770 (eff. Apr. 1, 2004). There is no question that respondent's conduct in this case tends to bring the legal profession into disrepute. As the majority itself points out, respondent, a licensed attorney, engaged in numerous and serious breaches of his fiduciary duty while acting as executor of his father's $700,000 estate. These breaches included (1) not funding the various trusts as required by the will but instead keeping the estate open and lending nearly $450,000 in estate assets to himself for his own personal benefit (*supra* ¶ 46); (2) failing to document any of these personal loans and thereby placing the assets of the estate at risk (*supra* ¶ 46); (3) failing to disclose to any of the estate beneficiaries that he was treating the estate as a personal line of credit (*supra* ¶ 47); and (4) making unauthorized distributions out of the estate (*supra* ¶ 53). These breaches extended over a period of five years, and they came to an end only after respondent's sister, a co-beneficiary of the estate, learned of respondent's conduct and filed a petition to terminate independent administration. *Supra* ¶¶ 4-9.

¶ 115    The 1990 preamble states that the "practice of law is a public trust" and that "[l]awyers seeking to conform their conduct to the requirements of these rules should look to the values described in this preamble for guidance." Ill. R. Prof. Conduct, Preamble. Among the values articulated in the 1990 preamble is that lawyers should "maintain[ ] public confidence in the system of justice by acting competently and with loyalty to the best interests of their clients." *Id.* Similarly, paragraph 5 of the 2010 preamble now states that "[a] lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs." Ill. R. Prof. Conduct (2010), Preamble, ¶ 5 (eff. Jan. 1, 2010). The majority's own analysis confirms that respondent's conduct in this case did not accomplish any of these things. On the contrary, respondent's conduct undermined confidence in the legal profession, displayed a profound lack of loyalty to the best interests

of those to whom he was acting as fiduciary, and certainly did not conform to the requirements of the law governing fiduciary relationships. And while this may have been only a "personal affair," it is worth noting that, as far as personal affairs go, the administration and execution of an estate is about as closely connected to the formal legal process as one can get. Historically, estate executors and administrators served formally as agents of the court itself, exercising by delegation the court's power and the court's responsibility over the estate. See *Will v. Northwestern University*, 378 Ill. App. 3d 280, 292 (2007). The rise of independent administration has weakened that connection over the years, but the fact remains that even independent executors and administrators are discharging responsibilities that are closely connected with and directly serve the legal system. All this to say that respondent's conduct in this case, while technically "personal," also bore a very close connection to the profession he occupies. Accordingly, a higher standard of conduct was to be expected than what respondent displayed here.

¶ 116 The Hearing Board recommended that respondent's law license be suspended for four months. The Administrator is asking this court to suspend it for one year. In light of the mitigating factors that are present in this case—*e.g.*, that respondent repaid everything he borrowed and apparently at no time acted with an intent to deceive or defraud—I believe the Hearing Board's recommendation is appropriate, and that is the judgment I would support in this case.

¶ 117 For these reasons, I respectfully dissent.

¶ 118 JUSTICE KARMEIER joins in this dissent.