2021 IL App (1st) 200878-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
October 26, 2021

No. 1-20-0878

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| LOEBL SCHLOSMAN & HACKL, INC., | ) | |
| | ) | |
| Plaintiff and Counterdefendant-Appellee and Cross-Appellant, | ) ) ) | Appeal from the Circuit Court of Cook County |
| v. | ) ) | |
| | ) | Nos. 16 L 1821 and |
| AMIR AL ABOSY, | ) | 17 L 12488 (cons.) |
| | ) | |
| Defendant, Counterplaintiff, and Third-Party Plaintiff-Appellant and Cross-Appellee | ) ) ) | The Honorable Jerry A. Esrig, Judge Presiding. |
| | ) | |
| (Donald J. Hackl, Third-Party Defendant-Appellee and Cross-Appellant). | ) ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

### **ORDER**

¶ 1   *Held:*   Trial court's entry of summary judgment on claim for conversion is affirmed. Trial court's bench trial rulings on claim for breach of promissory note not against manifest weight of the evidence. No error was shown in trial court's rulings that terminated shareholder was entitled to severance payment for six months, that he retained shares following termination, that no reasonable attorney fees were recoverable under the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2014)), or that firm's principal was not personally liable for firm's failure to make severance payment.

¶ 2       This cross-appeal follows a bench trial that resolved various claims involving the employment relationship of Amir Al Abosy (Al Abosy),[1] who is the defendant, counterplaintiff, and third-party plaintiff in this case, and Loebl Scholsman & Hackl, Inc. (LSH), which is the plaintiff and counterdefendant. Al Abosy is an architect, and LSH is an architectural firm of which he was an employee and shareholder. The third-party defendant, Donald J. Hackl, is also an architect and the president of LSH.

¶ 3                          I. BACKGROUND

¶ 4                        A. Claims raised by the pleadings

¶ 5       On February 19, 2016, LSH filed a two-count complaint against Al Abosy for (1) breach of a promissory note and (2) conversion. The count for breach of promissory note alleged that Al Abosy had failed to make $15,000 worth of payments due under the terms of a promissory note that he had executed at the time he became a shareholder of LSH. The count for conversion alleged that Al Abosy had transferred $67,361.12 from LSH's bank account to his personal account without authority. Al Abosy filed an answer denying the material allegations of LSH's complaint.

¶ 6       Al Abosy also filed counterclaims against LSH and a third-party complaint against Hackl. In his operative third amended counterclaim, Al Abosy asserted claims against LSH for (1) breach of contract, (2) violations of the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq.* (West 2014)), (3) an accounting, and (4) employment discrimination in violation of the Illinois Human Rights Act (775 ILCS 5/1-101 *et seq.* (West 2014)).

¶ 7       The third amended counterclaim alleged that Al Abosy had become an employee of LSH in 1999 and continued in that capacity until February 3, 2016. On January 1, 2009, Al Abosy had

---

[1] Throughout the record, Al Abosy's name appears in both hyphenated and unhyphenated format. As Al Abosy's name is unhyphenated in his own briefs, we follow that format in this decision.

become a minority shareholder of LSH and had executed a written employment agreement with LSH on that date, a copy of which was attached to the counterclaim. On about September 15, 2015, Hackl told Al Abosy that LSH intended to repurchase Al Abosy's shares of LSH but that, because the shares had no value, Al Abosy would receive no money for the repurchase. Al Abosy responded that he would not agree to sell his shares back to LSH without receiving compensation. He asserted that the shares had a value above zero, but he was unable to calculate their value because Hackl denied him access to LSH's books and records.

¶ 8    The counterclaim further alleged that at that time, Al Abosy and Hackl orally agreed that Al Abosy would continue to work for LSH as an employee after September 15, 2015, and that Al Abosy would be paid either (1) his annual base salary of $90,000 plus bonuses due under the employment agreement, or (2) hourly compensation of $190 per hour for work actually performed. In reliance on this promise, Al Abosy performed at least 280 hours of work for LSH between September 19, 2015, and February 3, 2016. It alleged that Hackl knew that he had performed this work but nevertheless refused to pay him any compensation for it. It further alleged that LSH had refused to reimburse Al Abosy for expenses he incurred in conjunction with his work during that time period, a profit-sharing bonus for 2015, and various travel expenses and vacation time that he incurred throughout his time at LSH. Among the specific items of damages sought in both the counts for breach of contract and for violations of the Wage Act were (1) $53,200 in unpaid base salary (for 280 hours of work at $190 per hour between September 19, 2015, and February 3, 2016); (2) $11,662 as a profit-sharing bonus for fiscal year 2015; (3) $25,781.12 in unreimbursed business and travel expenses; and (4) $15,000 for accrued vacation time. No specific allegations were made or damages sought for any unpaid termination payment due under section 5(ii) of the employment agreement.

¶ 9    Al Abosy's operative amended third-party complaint against Hackl was based on a similar set of facts as his counterclaim against LSH. Count I sought damages against Hackl for violations of the Wage Act. Count II sought damages for breach of fiduciary duties owed to Al Abosy as a fellow shareholder. Count III sought an accounting. Al Abosy later filed a separate lawsuit against Hackl containing claims of defamation, false light invasion of privacy, and intentional interference with prospective economic advantage. That separate lawsuit was consolidated with this one, but the claims in it are not pertinent to the issues on appeal.

¶ 10                    B. Summary judgment on the conversion claim

¶ 11    Following discovery, Al Abosy filed a motion for summary judgment on LSH's claim for conversion. Al Abosy's motion was supported by his own affidavit asserting that, at all times since 2009, he had an ownership interest in LSH. By February 2016, he and Hackl were the only two shareholders of the company. His affidavit stated that on February 2, 2016, he received an email from Chase Bank notifying him that it had started to process a wire transfer of $30,000 from LSH's account to Hackl. Al Abosy stated in his affidavit that he was alarmed by this news because the money in LSH's account was a company asset that needed protection, and he believed Hackl was depleting the LSH bank account to avoid making payments to Al Abosy and to the others to whom LSH owed money. Al Abosy thus forwarded the bank's email to Hackl and informed him that he was going to try to stop the transfer. Al Abosy then obtained a cashier's check from Chase Bank in the amount of $30,000, and he notified Robert Richards, the attorney for LSH and Hackl, that he had done this. Al Abosy also transferred $37,361.12 from LSH's bank account to his own account. He stated that he took these actions to get Hackl to discuss with him LSH's "difficult financial circumstances," but Hackl refused to do so. Al Abosy further stated that in April 2016, he was granted leave to deposit the sum of $67,361.12 with the Clerk of the Circuit Court of Cook

County and that the funds had been deposited there. In his motion for summary judgment, Al Abosy argued that there was no conversion because he was authorized to transfer the money out of LSH's bank account and because LSH was not permanently or indefinitely deprived of the money by Al Abosy's actions.

¶ 12    In response, LSH argued that a genuine issue of material fact existed about whether Al Abosy had authority to transfer the money. Its response was supported by the affidavit of Hackl, which stated that Al Abosy lacked authority from LSH to transfer the money and that "[t]wo authorized signatures were required per company policy." Hackl's affidavit further stated that LSH's failure to remove Al Abosy as a signatory on LSH's bank account was an oversight and did not confer authority on him to withdraw money from the company. On April 19, 2019, the trial court granted summary judgment in favor of Al Abosy on LSH's claim for conversion.

¶ 13                          C. Bench trial

¶ 14               1. LSH's breach of promissory note claim against Al Abosy

¶ 15    The case proceeded to bench trial on the remaining claims. No opening statements are included in the record on appeal. The trial court began by hearing testimony limited to LSH's claim against Al Abosy for breach of his obligations under the promissory note. Hackl was the first witness to testify. He testified that he was a shareholder of LSH and had served as its president since 1975. He identified the promissory note that had been executed by Al Abosy to finance his purchase of 75 shares of LSH stock on January 1, 2009. The promissory note reflected a promise by Al Abosy to pay $39,245.25 plus interest to LSH by December 31, 2010. Hackl testified that Al Abosy had not paid the full amount due under the promissory note and that a balance of $15,000, plus interest, was shown unpaid on LSH's financial statements. Hackl testified that LSH was seeking a judgment against Al Abosy for $15,000 plus interest.

¶ 16    On cross-examination, Hackl testified that he did not know the method by which the balance owed on the promissory note had been reduced from $39,245.25 to $15,000. He did not know whether the shareholder bonuses to which Al Abosy had been entitled were applied by LSH to offset the amount he owed under the note, as that matter had been handled by LSH's chief financial officer. He confirmed that LSH's tax return for 2016 contained no amount listed under the item for "Loans to shareholders."

¶ 17    The second witness to testify was Mark F. Mann, a certified public accountant who testified that he had served as the accountant for LSH for over 30 years. He testified that LSH's tax return for 2009 reflected an entry of $19,622 on the line-item for "Loans to shareholders." He testified that its tax returns for 2010 through 2014 reflected an entry of $15,000 on that line-item, and for 2015 it was zero. He testified that the tax return for 2013 showed a deduction for a bad debt expense of $15,000, but that this was done for tax purposes and did not impact the obligation of a note's obligor. He testified that the schedule K-1 sent by LSH to Al Abosy for 2012 showed his share of income of $17,191 based on his percentage of ownership of LSH. He testified, however, that there was no connection between this number and any money actually paid to shareholders. On cross-examination, Mann testified that he was aware that the original amount due on the promissory note was about $39,000, that there was no indication in the tax documents that $39,000 had been owed, and that he did not know how the $39,000 balance was reduced to $15,000. Mann also testified that in 2014 he had a conversation with Al Abosy about whether the $17,191 share of income due to Al Abosy could be applied by LSH to the amount he owed under the promissory note, and Al Abosy told him that was something he and Hackl had agreed to. He testified that he had advised Al Abosy not to do it that way and to issue checks instead, because it could have tax implications for Al Abosy's income and for LSH's status as an S-corporation.

¶ 18     The third witness to testify on this count was Al Abosy. He testified that he started working as an employee of LSH in 2000, and he became a principal and a shareholder on January 1, 2009. He identified his employment agreement, which was admitted into evidence, and he testified that under it he was eligible for an annual bonus that was a percentage of the bonus distributed to all officers of the company. He testified that at the time when he signed the promissory note and other documents associated with his becoming a shareholder of LSH, he had a conversation with Hackl in which Hackl told him that his bonus would cover the cost of his purchase of the shares. He testified to two conversations he had with LSH's chief financial officer in which he was told that his 2009 bonus of $20,968 as shown on his schedule K-1 and his 2010 bonus of $9,429 would be applied to his debt. He testified to a conversation in which he was told by Hackl that his 2012 bonus of $17,191 would be applied to the debt and would extinguish the debt.

¶ 19     Hackl was called in rebuttal to Al Abosy's testimony. Hackl testified that he never had a conversation in which he told Al Abosy that the amount of the bonus income shown on the schedule K-1 would be used to retire the debt owed under the promissory note. He testified that he explained three times to Al Abosy that the amount constituted a capital contribution. He testified that by the timeframe at issue, LSH was facing financial difficulty after experiencing several years of declining revenue and that Al Abosy was aware of this.

¶ 20     2. Al Abosy's breach of contract, Wage Act, and accounting claims

¶ 21     After LSH rested on its claim for breach of promissory note, the bench trial proceeded on the various claims asserted by Al Abosy against LSH and Hackl. We summarize only the testimony relevant to the issues raised on appeal, which are the claims for breach of contract, violations of the Wage Act, and accounting. Al Abosy's breach of contract and Wage Act claims involved several aspects. The aspect upon which Al Abosy ultimately prevailed, and which is the aspect

involved in this appeal, arose out of section 5(ii) of his employment agreement, which provided in pertinent part:

"5. Termination Payment. If the Principal [*i.e.* Al Abosy], retires or otherwise terminates his employment for any reason, other than termination by the Company [*i.e.*, LSH] for cause, or if his employment with the Company is terminated at any time thereafter for reasons of his death or Disability, the Company shall pay to the Principal (or, in the event of his death, to his estate), subject to the provisions of the Restricted Stockholders Agreement, the following compensation for a Benefit Period, not to exceed twelve (12) months, accrued at a rate of one month for each year of service completed while a Principal:

\* \* \*

(ii) amounts payable each month of the Benefit Period, each amount to be equal to the monthly installment of salary paid to the Principal immediately prior to his termination of employment \* \* \*."

¶ 22        Al Abosy testified that in about August 2015, Hackl first discussed with him the topic of LSH closing its architectural practice. Hackl and Al Abosy met with attorney Richards in September 2015 to discuss the best way for LSH to go out of business. Later that month, LSH terminated its lease for office space and closed its physical office. On about September 18, 2015, Al Abosy received his final paycheck and a W-2 form for the year from LSH. He testified that his final payment from LSH did not include any extra payments for severance or a bonus.

¶ 23        He testified that around that same time, he and Hackl discussed that he would continue to do work for LSH after September 15, 2015. Al Abosy testified that at that time, he was working on two projects for LSH, which were storage buildings on Devon Avenue and on 111th Street in Chicago. He testified that he and Hackl had orally agreed that he would be paid either a percentage

of his salary or an hourly rate of $190 per hour for work actually done. He also testified that LSH had an office in the Middle East, and he was involved in work there to collect payments due and market LSH's architectural practice.

¶ 24      Al Abosy testified that on September 15, 2015, Hackl orally informed him that LSH intended to repurchase his shares of stock in the firm. This was later confirmed in a letter sent to him by LSH. Al Abosy testified that Hackl told him that he would receive nothing for the repurchase of his shares, and Al Abosy refused to agree to this repurchase. He testified that Hackl told him that he intended to "shut down" the firm.

¶ 25      Al Abosy testified that a former LSH partner named Jim Pritchett had retired in 2014. Al Abosy was shown a letter sent by Hackl on behalf of LSH to Pritchett, dated July 30, 2015, which stated in part, "In accordance with Article 5(ii) of your Employment Agreement, you are entitled to a year annual salary based upon your salary on the date of retirement." Al Abosy testified that this provision was also in his employment agreement. The letter to Pritchett also stated, "You have the right to retain ownership of your shares with benefits associated therewith." Al Abosy testified that he was not given the option by Hackl to retain his shares with their associated benefits.

¶ 26      Al Abosy testified that after September 15, 2015, he continued to work on the projects on Devon Avenue and on 111th Street. He testified to the work that he performed on these projects. He testified that Hackl was aware of the work he had performed, about various documents involving his work on those projects, and about various communications with Hackl about that work. He testified that he performed 280 hours of work on the projects for LSH but that he never submitted these hours to LSH for payment. He testified that he was never paid any compensation for the work he performed for LSH between September 2015 and February 2016 and that he has never received any payment from LSH after February 2016.

¶ 27 Al Abosy testified that on February 2, 2016, he received an email from Chase Bank that Hackl was transferring $50,000 from LSH's company bank account to his personal account. Al Abosy testified that he then sent an email to Hackl stating that they needed to have a discussion about why the firm was spending money but not paying Al Abosy. He testified that he stopped the wire transfer from occurring and transferred a sum of money from LSH's account into his personal account, which was ultimately deposited with the court. He and Hackl had a phone conversation several days later about Al Abosy's stopping payment on Hackl's transfer, and Al Abosy testified that Hackl threatened him in this conversation. He testified that on February 8, 2016, he and Hackl had a meeting with attorney Richards to discuss the firm's financial obligations. At that meeting, Richards and Hackl provided Al Abosy with a document showing LSH's financial obligations. That document reflected payments owed to several employees. It also included an entry stating, "Alabosy [*sic*] for Devon," but no amount was listed next to that entry.

¶ 28 Al Abosy testified that he incurred business expenses associated with trips he took to the Middle East on behalf of LSH between April 2012 and December 2015, totaling $30,344. He testified these were never submitted to LSH prior to the filing of this lawsuit. He testified that his schedule K-1 from LSH for 2015 showed that he was entitled to business income of $11,622, but he never received a payment in this amount from LSH. He testified that Hackl refused to pay him accrued vacation time unless he agreed to surrender his stock. Al Abosy testified to a number of conversations he had with Hackl discussing the value of LSH as a company.

¶ 29 Attorney Robert Richards was called to testify concerning the financial difficulties that LSH was facing between 2013 and 2015 and his work associated with the closing of its practice by September 2015. He testified concerning the meeting he had with Hackl and Al Abosy on February 8, 2016, largely on the topic of whether Hackl made a defamatory statement at that meeting.

¶ 30    The next witness to testify was Bhan Al Abosy, who is Al Abosy's wife. She gave testimony pertaining to Al Abosy's claim for employment discrimination, concerning statements made by Hackl about Arabs. Al Abosy then rested. The court granted a motion for directed verdict on the claims for defamation, false light, intentional interference with prospective economic advantage, and discrimination. It denied a motion for directed verdict on the claims for breach of contract, violations of the Wage Act, accounting, and breach of fiduciary duty.

¶ 31    The first witness called in the defense case was Gary Delaney, who testified that he worked for a company called Banner that was involved in the development of self-storage buildings on Devon Avenue and on 111th Street in Chicago. Banner hired LSH as the architects for those developments. He testified that he worked with Al Abosy on those projects. He testified that he requested Hackl remove Al Abosy from the Devon Avenue project because he was taking too long to respond to requests for information and causing delays on the project. He testified that on the 111th Street project, Al Abosy provided a design that was beyond the property line and over budget by 20%. He testified that he demanded LSH remove Al Abosy from both projects, which it did.

¶ 32    The next witness to testify was apparently Hackl. However, no transcript of his direct examination is included in the report of proceedings. A transcript of what is apparently Hackl's cross examination is contained in the common law record, as an exhibit to Al Abosy's posttrial brief. On cross-examination, Hackl testified that he had terminated Al Abosy on September 15, 2015. He testified that the reason he terminated Al Abosy was because two other individuals to whom he had offered the opportunity to purchase shares had refused to do so if Al Abosy was also a shareholder. He agreed that Al Abosy's employment agreement included section 5(ii), which entitled him to a severance payment if he left under the terms described in that section. He testified that LSH's tax return for 2016 listed Al Abosy as a shareholder. He testified that Al Abosy had

volunteered to work *pro bono* for LSH after September 23, 2015, but he was shown various emails after that time on the topic of Al Abosy submitting time or requesting to be paid for work done. He also testified about various emails and documents concerning work done by Al Abosy after September 15, 2015. He testified that LSH ultimately did not go out of business and continued to receive income in 2016.

¶ 33    Wendy Anderhous testified that she had been an accountant and office manager for LSH since 2002. Her job included doing payroll for the firm. She testified that in Al Abosy's last paycheck in September 2015, he received two weeks of severance pay and payment for 246 hours of vacation time, which is all of the vacation time he was due. She testified that all employees were given two weeks of severance after the office closed. She testified that there was a requirement at LSH that any employee expenses be approved prior to being incurred in order for those expenses to be reimbursable.

¶ 34    Following Anderhous' testimony, LSH and Hackl rested. After they did so, Al Abosy's counsel indicated that he wanted to call Al Abosy in rebuttal. The trial court and the attorneys then engaged in a colloquy about whether the proposed testimony by Al Abosy was truly rebuttal testimony. During that discussion, the trial court asked the attorneys to specify exactly what relief they were seeking on their claims. In explaining the relief that was being requested, Al Abosy's attorney stated, "There's also the employment agreement that provided for him to get a year of payment *** that you heard about." His counsel also requested (1) payment for work Al Abosy's did on projects after September 15, 2015, (2) payment for unpaid vacation time and expenses he incurred, (3) a declaration that Al Abosy continues to own his shares in LSH and they were never repurchased or otherwise taken away from him, and (4) an accounting.

¶ 35    3. Trial court's preliminary and final rulings

¶ 36 After hearing brief rebuttal testimony, the trial court stated that it was going to give the parties a preliminary indication of how it intended to rule so that the parties could better focus any closing arguments or written briefs. In summary, it explained that it found LSH had failed to meet its burden of proof of any amount remaining due on the promissory note and that the testimony on that issue was not credible in the absence of an explanation of how LSH had arrived at the sum of $15,000 as the amount owed. The trial court also stated that it found that Al Abosy had failed to meet his burden of proving any amount he was due for work done after September 15, 2015, as his failure to keep time records was inconsistent with an agreement that he would be paid after that date. The court went on to state, however, that it found Al Abosy was entitled to recover "the compensation on termination provided for in section five of the employment agreement." It found that he was not entitled to any unpaid vacation time, expenses incurred, or shareholder bonuses. It found that Hackl had no authority to take Al Abosy's shares on behalf of LSH and that Al Abosy remained a shareholder of the company.

¶ 37 It was then agreed that the parties would submit closing cross-briefs, including on Al Abosy's entitlement to a termination payment under section 5(ii) of the employment agreement and on Hackl's personal liability for a violation of the Wage Act by LSH. The parties then submitted written closing briefs and returned several weeks later for focused oral arguments and the trial court's final ruling.

¶ 38 In ruling, the trial court stated that it found on behalf of Al Abosy on LSH's claim for breach of promissory note for the reasons it had stated in its preliminary ruling. As to Al Abosy's breach of contract claim, the court found that Al Abosy had become a principal of LSH on January 1, 2009, when he executed the employment agreement and that he was terminated on September 15, 2015. It found he was terminated without cause and rejected LSH's argument that section 5(ii) was

inapplicable whenever an employee is terminated by the company, because such an interpretation would cause the phrase "other than termination by the Company for cause" in section 5(ii) to have no meaning. It found that Al Abosy was entitled to six months of severance under section 5(ii), at $7,500 per month ($45,000) plus prejudgment interest. On the Wage Act claim, it found that Al Abosy was entitled to the same $45,000 under section 5(ii), plus statutory interest at 2% beginning when the amounts came due. It found that the amounts recoverable under the breach of contract and Wage Act claims were not cumulative and that Al Abosy could collect principal and interest on one claim or the other.

¶ 39    The court further found that Al Abosy was not entitled to attorney fees under the Wage Act claim, because "none of the fees here were reasonable, at least as related to the claims made under the [Wage] Act." It found that to the extent that attorney fees were incurred in connection with Wage Act claims, they were spent on the aspects of the claim that had been unsuccessfully prosecuted. The court noted that Al Abosy had never made any demand for a termination payment by pointing to the plain language of section 5(ii), which the court called a "straight forward" claim. It found that if he had demanded payment and LSH had refused to pay, the claim for severance could have been summarily resolved without the necessity of trial; absent evidence of such a demand being made and LSH's refusal to pay it, however, the court stated that it could not find that the attorney fees incurred were reasonable.

¶ 40    The trial court further found that Hackl was not personally liable on the Wage Act claim. It found that, without a demand for a termination payment under section 5(ii), it could not be said that Hackl had made a knowing or conscious decision to withhold a termination payment to Al Abosy. The court stated that the evidence tended to show that "Al Abosy did not appreciate that he had a right to severance pay under the agreement, and that LSH did not appreciate that it had

an obligation to pay him."

¶ 41    The court found that LSH had no right to demand the return of Al Abosy's stock, that no transfer of stock had ever occurred, and that Al Abosy is and at all times had been a shareholder of LSH. It therefore found that Al Abosy was entitled to an accounting of LSH's books and finances from January 1, 2000, through the present time. Finally, it found no damages had been caused by any alleged breach of fiduciary duty and therefore found in favor of Hackl and against Al Abosy on that claim.

¶ 42                                  D. Posttrial motions

¶ 43    Both parties filed posttrial motions. Al Abosy filed a motion to modify the judgment order by finding Hackl personally liable for LSH's violation of the Wage Act, by awarding Al Abosy attorney fees under the Wage Act, and by finding that Al Abosy was entitled to eight months of termination pay instead of six. On this third argument, he asserted that he should be credited with a month of termination pay for his years of service completed as a "principal" of LSH during 2008 and 2015. With respect to his argument concerning 2008, he attached an employment agreement from that year, which had not been introduced at the bench trial, identifying him as a "principal" of LSH as of January 1, 2008.

¶ 44    LSH and Hackl also filed a motion to reconsider the judgment. That motion argued that LSH had sustained its burden of proof on the breach of promissory note claim, that Al Abosy was not entitled to a termination payment under the employment agreement, and that the trial court had incorrectly ruled that LSH lacked the authority to repurchase Al Abosy's shares. In support of this third argument, the motion attached an unsigned document titled "Amended and Restated Restricted Stockholders Agreement" that does not appear to have been introduced into evidence at trial.

¶ 45    The trial court denied Al Abosy's motion to modify the judgment and LSH and Hackl's motion to reconsider. No transcript of the hearing at which these motions were argued or decided is included in the record on appeal. The parties then filed cross-appeals involving various rulings by the trial court.

¶ 46                                    II. ANALYSIS

¶ 47                        A. Summary judgment on LSH's conversion claim

¶ 48    We begin our analysis with the claim raised by LSH in its cross-appeal that the trial court erred in granting summary judgment in favor of Al Abosy on its claim for conversion. Summary judgment is appropriately granted if the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). A court construes the pleadings, depositions, admissions, and affidavits strictly against the movant and considers the motion for summary judgment in the light most favorable to the nonmoving party. *Gillespie v. Edmier*, 2020 IL 125262, ¶ 9. This court's review of an order granting summary judgment is *de novo*. *Id.*

¶ 49    On appeal, LSH argues that a genuine issue of material fact existed about whether Al Abosy had authority to transfer $67,361.12 from LSH's company bank account into his personal bank account. LSH does not dispute that Al Abosy was a signatory on its account at Chase Bank and was authorized to make financial transactions out of it. However, LSH argues that he lacked authority in this instance because, according to Hackl's deposition testimony, LSH had a "two-signature policy" on all checks or other financial transactions and Al Abosy transferred the money without obtaining two signatures. LSH also argues that Al Abosy was no longer an employee or shareholder in February 2016 when he made the transactions. Finally, it argues that the evidence showed that LSH was deprived of the use of its money for an indefinite time, thus establishing a

conversion.

¶ 50    Conversion has been defined as any unauthorized act that deprives a plaintiff of its property " ' "permanently or for an indefinite time." ' " *In re Karavidas*, 2013 IL 115767, ¶ 60 (quoting *In re Thebus*, 108 Ill. 2d 255, 259 (1985) (quoting *Union Stock yard & Transit Co. v. Mallory, Son & Zimmerman Co.*, 157 Ill. 554, 563 (1895))). " ' "The essence of an action for conversion is the wrongful deprivation of property from the person entitled to possession." ' " *Karavidas*, 2013 IL 115767, ¶ 60 (quoting *Thebus*, 108 Ill. 2d at 260 (quoting *Farns Associates, Inc. v. Sternback*, 77 Ill. App. 3d 249, 252 (1979))). To establish a claim for conversion, a plaintiff must show that: (1) it has a right to the property at issue; (2) it has an absolute and unconditional right to the immediate possession of the property; (3) it made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Karavidas*, 2013 IL 115767, ¶ 61.

¶ 51    In this case, the trial court's precise reasoning for granting summary judgment in favor of Al Abosy on the conversion claim is not disclosed by the record. We note however, that under *de novo* review, we may affirm the granting of summary judgment on any basis supported by the record, regardless of whether the trial court relied upon that basis. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34.

¶ 52    Al Abosy's motion for summary judgment argued, *inter alia*, that LSH had no evidence to show that he had wrongfully and without authorization assumed, control, dominion, or ownership over the funds in LSH's bank account. In support of his motion, Al Abosy submitted his own affidavit stating that, on February 2, 2016, when the only two shareholders of LSH were himself and Hackl, he received an email from Chase Bank informing him that Hackl was in the process of transferring $30,000 from the company account to his personal account. Al Abosy's affidavit

stated that he became alarmed by this news, as the funds in the account were company assets and he believed that Hackl was depleting company funds to avoid making payments to Al Abosy and others to whom LSH owed money. Al Abosy sent an email to Hackl and told him that he was going to stop the transfer. After consultation with the bank, Al Abosy obtained a cashier's check in the amount of $30,000 and notified LSH's attorney Richards about his doing so. Al Abosy further transferred the sum of $37,361.12 from the LSH account into his own account. His affidavit stated that he sequestered the funds "in order to get Hackl to discuss with me, as the only two remaining shareholders in the company, how the obligations of LSH were to be handled in light of LSH's difficult financial circumstances." He stated that he was sued by LSH on February 19, 2016, and that after he was served, the trial court granted him leave to deposit the sum of $67,361.12 with the Clerk of the Circuit Court of Cook County, which he did on May 3, 2016.

¶ 53     Significantly, while LSH submitted a counter-affidavit by Hackl in response to the motion for summary judgment, that counter-affidavit did not dispute any of the facts set forth in Al Abosy's affidavit. Facts contained in an affidavit in support of a motion for summary judgment that are not contradicted by a counter-affidavit (or by depositions or admissions) are admitted and must be taken as true for purposes of a motion for summary judgment. *Purtill v. Hess*, 111 Ill. 2d 229, 241 (1986). Instead, LSH argued to the trial court that a genuine issue material fact existed only on the basis of Al Abody's authority to make a bank transfer without obtaining two signatures. LSH relied upon the deposition and affidavit of Hackl to argue that the two-signature requirement was "company policy." LSH also argued that it was deprived of its property for an indefinite time, as the money was on deposit with the clerk of the circuit court and unavailable to LSH.

¶ 54     We hold that LSH failed to show that a genuine issue of material fact existed about whether Al Abosy wrongfully and without authorization assumed control, dominion, or ownership over

property in LSH's possession. It is undisputed that Al Abosy was one of two principals of LSH and was authorized to engage in financial transactions on LSH's bank account. We must accept as true Al Abosy's uncontradicted affidavit testimony that he transferred LSH's funds to his personal account in order to sequester those funds on the belief that Hackl, the only other shareholder of the company at the time, was depleting the company's assets to avoid paying its creditors. Al Abosy immediately informed Hackl and LSH's attorney of what he was doing and that he did this only to cause Hackl to discuss the firm's difficult financial situation with him. No evidence was presented that Al Abosy did anything with LSH's funds other than to place them into his own bank account for safekeeping and ultimately deposit them with the Clerk of the Circuit Court of Cook County. As to LSH, this was not a wrongful and unauthorized assumption of control, dominion, or ownership over property belonging to it. See *Kovitz Shifrin Nesbit, P.C. v. Rossiello*, 392 Ill. App. 3d 1059, 1066 (2009) (law firm did not wrongfully assume control, dominion, or ownership over disputed money where it held funds in an escrow pending attorney's lien adjudication, filed action for interpleader, and sought to deposit funds with the court). LSH's assertion that Al Abosy lacked authorization to transfer the money because LSH had a company policy of requiring two signatures on financial transactions is a conclusory statement that is insufficient to raise an issue of fact about Al Abosy's authorization to transfer the money, especially where that two-signature requirement was not honored by Chase Bank. We affirm the trial court's granting of summary judgment.

¶ 55     B. Whether ruling on promissory note claim was against the manifest weight of the evidence

¶ 56     We next address the argument raised by LSH in its cross-appeal that the trial court's ruling was against the manifest weight of the evidence on LSH's claim alleging that Al Abosy had breached his obligation to repay the promissory note. When a party challenges a trial court's ruling following a bench trial, the applicable standard of review on appeal is whether the trial court's

judgment is against the manifest weight of the evidence. *Longo Realty v. Menard, Inc.*, 2016 IL App (1st) 151231, ¶ 19. A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on evidence. *Id.* Under this standard of review, the appellate court gives great deference to the trial court's determinations on credibility and does not substitute its own judgment for that of the trial court, because the finder of fact is in the best position to evaluate the conduct and demeanor of the witnesses. *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35. The findings and judgment of the trier of fact will not be disturbed if there is any evidence in the record to support its findings. *Id.*

¶ 57    On appeal, LSH argues that it sustained its burden of proving that Al Abosy owed the sum of $15,000 on the promissory note and that Al Abosy "adduced absolutely nothing in opposition to LSH's proofs." LSH begins its argument by asserting that its accountant, Mark Mann, testified that the balance due on the note at the end of 2009 was $19,622.62, and this balance was shown as a loan to shareholders on its federal tax return. LSH misstates Mann's testimony on this point. His actual testimony was that LSH had a loan to shareholder in this amount shown on its 2009 tax return, but there was nothing in Mann's testimony connecting the amount shown on the tax return to the promissory note signed by Al Abosy. LSH goes on to make the assertion that the only loan to shareholder was the loan to Al Abosy, but it fails to cite the record on this point and we do not find that any such testimony was given at trial by any witness.

¶ 58    LSH goes on to state that Mann testified that in 2010, payments in the amount of $4,622.62 were made on the note and reduced its balance to $15,000 by the end of that year. However, LSH again misstates Mann's testimony on this point. His testimony was again made with respect to amounts shown on LSH's tax return, but there was nothing in his testimony connecting the

amounts shown on the tax returns to the promissory note at issue. Moreover, when asked what accounted for the difference between the $19,622.62 reflected at the beginning of 2010 and $15,000 at the end of that year, he answered, "I don't know." Asked if it could reflect a payment being made on the note, he answered, "It could, yes."

¶ 59    LSH next asserts that Mann testified that no additional payments were made on the promissory note, according to the firm's records. However, LSH again fails to cite the record and we find no such testimony by Mann. LSH asserts that Al Abosy "did not even attempt to disprove LSH's proofs on the Note at trial." Again, this statement is inaccurate, as the trial court heard ample evidence from Al Abosy that LSH's chief financial officer told him that his 2009 bonus of $20,968 and his 2010 bonus of $9,429 would be applied to his debt, and that Hackl told him that his 2012 bonus of $17,191 would be applied to the debt and extinguish it. The trial court was shown documents, including schedule K-1s from LSH to Al Abosy and emails between Al Abosy and Mann on the issue, substantiating that such conversations had occurred. There was also evidence that the debt had been written off, at least for tax purposes, as of 2015.

¶ 60    In conclusion, LSH has failed to show that the trial court's finding on its count for breach of the promissory note was against the manifest weight of the evidence. We agree with the trial court that there was a complete failure of proof on the topic of how LSH calculated that the balance due on the promissory note was $15,000. LSH failed to introduce any testimony on this point. It did not introduce any business records documenting payments made to reduce the sum to this amount from the $39,245.25 originally due on the note. It was well within the purview of the trial court to find that the testimony presented by LSH lacked credibility in the absence of evidence showing how this number was reached, or to believe the evidence presented by Al Abosy that LSH's principals had told him that his shareholder bonuses were being applied to his debt and had fully

extinguished it as of 2012.

¶ 61    C. Trial court's ruling that employment agreement entitled Al Abosy to a termination payment

¶ 62    The next argument made by LSH in its cross-appeal is that the trial court erred by finding that Al Abosy was entitled to a termination payment under section 5(ii) of his employment agreement. LSH argues that, under the plain language of section 5(ii) of the employment agreement, a principal of LSH is entitled to a termination payment only if that person retires, terminates their own employment, dies, or becomes disabled. If the company terminates the person's employment, then that person is not entitled to a termination payment. LSH argues that, because Al Abosy was terminated by LSH and thus did not retire, terminate his own employment, die, or become disabled, he is not entitled to a termination payment under section 5(ii).

¶ 63    To the extent that a party challenges a trial court's rulings in a bench trial on purely legal grounds, we review the trial court's rulings *de novo*. *Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177 (2004). Any issue involving the construction, interpretation, or legal effect of a contract is a question of law. *Ruffolo v. Jordan*, 2015 IL App (1st) 140969, ¶ 10. The main objective of contract interpretation is to ascertain and give effect to the intention of the parties. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). To do so, a court looks to the language of the contract as a whole and considers it in its full context. *Id.* Where the words in the contract are unambiguous, the court applies the language as written, given its plain, ordinary, and popular meaning. *Id.* A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used. *Id.* at 442.

¶ 64    The contract provision at issue, which is set forth in full above (*supra* ¶ 21), provided in pertinent part that LSH would pay a termination payment to a principal or the principal's estate

"[i]f the Principal, retires or otherwise terminates his employment for any reason, other than termination by the Company for cause, or if his employment with the Company is terminated at any time thereafter for reasons of his death or Disability."

¶ 65     LSH contends that this provision applies only when a principal "terminates" his own employment, retires, dies, or becomes disabled, but not when the principal is terminated by the company. The trial court rejected this interpretation, reasoning that such an interpretation would cause the phrase "other than termination by the Company for cause" to have no meaning and be unnecessary. We agree with the trial court's interpretation. By specifying that "termination by the Company for cause" was an exception to the circumstances in which a principal who "terminates his employment for any reason" would receive a termination payment, the parties demonstrated an intent that this phrase was not limited to situations in which a principal terminates his own employment. An interpretation of "terminates his employment" as excluding all situations in which a principal is terminated by the company would nullify or render meaningless the phrase "other than termination by the Company for cause," which would be contrary to the principles of contract interpretation. *Thompson*, 241 Ill. 2d at 442.

¶ 66     At oral argument, LSH argued for the first time on appeal that Al Abosy's termination was "for cause" due to his conversion of funds, breaching of the promissory note, and refusal to tender his shares back to LSH. This argument is contrary to the trial court's finding that Al Abosy's termination was "without cause." LSH failed to argue in its opening brief that this finding by the trial court was against the manifest weight of the evidence, and its failure to do so results in a forfeiture of this argument. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in opening brief are forfeited and shall not be raised at oral argument). Thus, as LSH has forfeited any challenge to the trial court's finding that Al Abosy's termination was without cause, we find no

error in the trial court's determination that section 5(ii) applied in this circumstance.

¶ 67      LSH further argues that the trial court erred in finding that Al Abosy was entitled to a severance payment under section 5(ii) because his third amended counterclaim contained no allegation that he was entitled to such a payment and did not request it in its prayer for relief. In response, Al Abosy fails to point out any allegation of his third amended counterclaim alleging that he was entitled to a severance payment under section 5(ii) or requesting this as damages in his case. However, it does not appear that LSH brought this objection to the attention of the trial court. While it appears that LSH and Hackl did include one sentence in their written posttrial brief objecting that Al Abosy was not entitled to a severance payment because he "never claimed this severance payment in his pleadings," they never requested that the trial court make a ruling on this basis, even when the trial court asked after ruling if there was anything that it had not addressed.[2] We therefore find this argument was forfeited and is not before us. A party's failure to request a ruling from the trial court forfeits appellate review of an issue. *Tirado v. Slavin*, 2019 IL App (1st) 181705, ¶¶ 42-43. The importance of bringing this objection to the attention of the trial court was especially critical here, because it would have given the trial court the opportunity to determine, within its discretion, whether the pleadings could have been amended to conform to the proofs at trial. 735 ILCS 5/2-616(c) (West 2018); see *Albany Park Service, Inc. v. Kenny-Paschen Joint Venture*, 209 Ill. App. 3d 432, 436-37 (1991).

---

[2] We also note that LSH did raise this issue more thoroughly in its posttrial motion to reconsider. However, no transcript of the argument or ruling on the motion to reconsider is included in the record on appeal. Without a transcript of the hearing or an acceptable alternative (see Ill. S. Ct. R. 323 (eff. July 1, 2017)), we have no means of understanding the basis upon which the trial court exercised its discretion to deny the motion to reconsider and therefore no basis for concluding that such discretion was abused. As the party appealing this issue, LSH had the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Any doubts which may arise from the incompleteness of the record must be resolved against the LSH on this issue. *Id.* at 392.

¶ 68    D. Trial court's ruling that Al Abosy remained a shareholder and was entitled to accounting

¶ 69    The final argument by LSH and Hackl in their cross-appeal is that the trial court erred in its determination that Al Abosy had never lost his status as a shareholder of LSH. The trial court found, based on the evidence presented at trial, that LSH had no right to demand the return of Al Abosy's stock, that no transfer of the stock had ever occurred, and that Al Abosy is and has always been a shareholder of LSH.

¶ 70    LSH and Hackl argue that this finding by the trial court was erroneous. They assert that LSH had a contractual right to purchase Al Abosy's shares within ten days of his leaving the company, and that Al Abosy had the contractual obligation to sell his shares back to LSH. In support of this argument, they cite paragraph 5 of the "Agreement for Sale of Stock by Loebl Scholssman & Hackl Inc.," which was signed by Al Abosy on January 1, 2009, and admitted into evidence at trial. Paragraph 5 of that agreement provided that Al Abosy acknowledged and confirmed that "with respect to the share purchased hereunder, he shall be bound by the terms and conditions of the Shareholders Agreement." That "Shareholders Agreement" was further defined in the agreement for sale of stock to be the "Amended and Restated Restricted Stockholders Agreement among the Company and its Shareholders dated July 1, 1983, as amended by Amendments Numbers One, Two and Three (which Third Amendment was misdesignated First Amendment to the Amended and Restated Restricted Stockholders Agreement)."

¶ 71    LSH asserts that the Shareholders Agreement contains a provision that states, "Within ten days after a Withdrawing Shareholder leaves Company's employment, Company shall purchase and the Withdrawing Shareholder shall sell, all Shares owned by the Withdrawing Shareholder." It also asserts that the Shareholders Agreement defines a "Withdrawing Shareholder" to mean a shareholder who leaves the Company's employment for any reason.

¶ 72 However, the document that LSH and Hackl cite as the "Shareholders Agreement" is not a trial exhibit. The document they cite is an exhibit that was attached to their posttrial motion to reconsider. Further, the document they cite is unsigned. Al Abosy pointed out these deficiencies in his response brief, but the reply brief of LSH and Hackl makes no mention of where in the record on appeal it was admitted into evidence at trial or where a proper foundation was established for it. As such, we are unable to ascertain that this document was properly before the trial court at trial or that it is what LSH and Hackl assert it to be. Furthermore, when an argument is first brought to a trial court's attention by way of a posttrial motion, the issue on appeal is whether the trial court abused its discretion in denying that motion. *Rahill Corp. v. Urbanski*, 123 Ill. App. 3d 769, 776 (1984). Moreover, when such a motion is supported by evidence that was not presented at trial, it is properly denied where it appears that the evidence was in the movant's possession or discoverable in the exercise of due diligence and thus could have been presented at trial. *Id.*

¶ 73 No transcript of the hearing on the parties' posttrial motion is included in the record on appeal. Thus, we have no means of understanding the trial court's basis for rejecting the argument that the document attached to the posttrial motion of LSH and Hackl controlled the question of whether LSH maintained a contractual right to repurchase Al Abosy's shares. As LSH and Hackl were the appellants on this issue, they had the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a complete record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Any doubts that may arise from the incompleteness of the record must be resolved against LSH and Hackl on this issue. *Id.* at 392. Without a transcript of the hearing at which the posttrial motions were argued and ruled upon, there is no basis for this court to hold that the trial court abused its

discretion in denying the posttrial motion. *Id.* For these reasons, we have no basis for concluding from this document that the trial court erred in its determination that Al Abosy had never lost his status as a shareholder of LSH.

¶ 74                                    E. Al Abosy's claim for attorney fees under the Wage Act

¶ 75        Having disposed of all arguments raised by LSH and Hackl in their cross-appeal, we now turn to the arguments made by Al Abosy in his appeal. His first argument is that the trial court erred by determining that he was not entitled to recover attorney fees on his successful claim under the Wage Act (820 ILCS 115/1 *et seq.* (West 2014)). Al Abosy contends that fee-shifting was mandatory under section 14(a) of the Wage Act, which provides as follows:

> "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover *** in a civil action *** the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees." *Id.* § 14(a).

¶ 76        Where the issue on appeal is whether the trial court properly applied the law when it denied a request for attorney fees, a question of law is presented that we review *de novo*. *Kirk v. Arnold*, 2020 IL App (1st) 190782, ¶ 12. However, where the question involves the trial court's determination concerning the reasonableness of the attorney fees claimed, an issue is presented about which the trial court has broad discretion, and we will not reverse unless we find that the trial court has abused its discretion. *Norman v. U.S. Bank National Association, as Trustee for Structured Asset Mortgage Investments II, Inc.*, 2020 IL App (1st) 190765, ¶ 36.

¶ 77        Al Abosy asserts that the reason the trial court denied him attorney fees was because, instead

of applying section 14(a) of the Wage Act, it improperly relied on section 1 of the Attorneys Fees in Wage Actions Act, which requires, as a condition for the award of reasonable attorney fees, "that a demand [for wages due and owing] was made in writing at least 3 days before the action was brought." 705 ILCS 225/1 (West 2018). To support his assertion that this was the basis for its ruling, Al Abosy cites the trial court's statement, in explaining its reasons for denying attorney fees, that "Al Abosy never made any demand for severance under the employment agreement. Had he made such a demand and pointed to the plain language of the severance agreement, it may be that LSH would have paid him." Al Abosy asserts that, by requiring a demand be made for a severance payment, the trial court was imposing a condition not required by section 14(a) of the Wage Act. He further points out that section 14(a) was enacted in 2011 to allow for fee-shifting. See Pub. Act 96-1407, § 10 (eff. Jan. 1, 2011). Prior to the enactment of section 14(a) in 2011, attorney fees were only available in Wage Act cases under the authority of section 1 of the Attorneys Fees in Wage Actions Act (705 ILCS 225/1 (West 2010)). See *Thomas v. Weatherguard Construction Co.*, 2015 IL App (1st) 142785, ¶ 72. Thus, he contends, the trial court erred by applying an outdated statute in denying his request for attorney fees.

¶ 78       We reject Al Abosy's argument, as it misconstrues the trial court's reasoning for denying attorney fees. The trial court clearly stated that the reason it was denying attorney fees was because the Wage Act "only provides for the payment of reasonable attorney's fees, and none of the fees here were reasonable, at least as related to the claims made under the Act." Explaining further, the trial court explained that Al Abosy had never made any demand for severance under the employment agreement, and had he done so "and pointed to the plain language of the severance agreement, it may be that LSH would have paid him." The trial court stated that the claim for severance pay under section 5 of the employment agreement was "straight forward" and that, "if

- 28 -

demand had been made, and if LSH had refused to pay *** the claim for severance pay could have been summarily resolved without the necessity of trial or much of the legal work that was done here." The trial court further stated that, to the extent attorney fees were incurred in connection with a claim under the Wage Act, they were incurred for the portions of that claim on which Al Abosy did not prevail.

¶ 79    Our review of the record indicates that it was not an abuse of discretion for the trial court to conclude that no reasonable attorney fees had been incurred in connection with the only portion of the Wage Act claim on which Al Abosy prevailed. While somewhat unusual, it seems from our review of the record that Al Abosy prevailed on this portion of his Wage Act claim despite a minimal level of pleading, eliciting of testimony and evidence, or attorney argument specifically pertaining to his right to a severance payment under section 5(ii) of his employment agreement.

¶ 80    As we noted above, Al Abosy's third amended counterclaim includes no allegations or claim for recovery of a payment under section 5(ii) of the employment agreement. We see no pre-trial pleadings or motions in the record specifically referencing that section. It does not appear from the record that the attorneys made any opening statements in this case in which Al Abosy's attorney indicated he was making a claim under section 5(ii). While Al Abosy's attorney elicited testimony about the employment agreement as a whole and obtained its admission into evidence, we find no testimony elicited from Al Abosy specifically pertaining to section 5(ii). Instead, the only trial testimony by Al Abosy that we find addressing this section in any way is the following testimony by Al Abosy concerning the letter that Hackl had sent on behalf of LSH in 2015 to a different shareholder, Jim Pritchett, who was retiring from LSH:

"Q. Okay, okay. And in this letter from Mr. Hackl he indicates in point number five that 'In accordance with Article 5, small two, of your Employment Agreement, you are

entitled to a year annual salary based on your salary on the date of retirement'; do you see that?

A. Yes.

Q. Okay, and do you recall was that provision also in your employment agreement?

A. I believe so."

The only other testimony we see specifically concerning section 5(ii) was in the cross-examination of Hackl, in which he agreed that section 5(ii) was included in Abosy's employment agreement and that it entitled him to a severance payment if he left under the terms described in that section. Testimony was also elicited from Al Abosy that he received no payment from LSH after his final paycheck in September 2015 and that his final payment did not include any severance payment. However, this testimony was not elicited specifically with reference to any payment due under section 5(ii) of the employment agreement.

¶ 81 The only instance that we can find in which argument was specifically made concerning section 5(ii) occurred during a colloquy about whether Al Abosy would be allowed to offer certain rebuttal testimony. During this discussion, the trial court asked the attorneys to specify exactly what relief they were seeking in the case. In response, Al Abosy's attorney listed several items of relief, stating, "There's also the employment agreement that provided for him to get a year of payment *** that you heard about." Shortly after Al Abosy's attorney made that statement (and following brief rebuttal testimony), the trial court stated that it was going to give the parties a preliminary indication of how it intended to rule to enable them to better focus their closing arguments. In doing so, the trial court stated that, while it was "happy to hear [LSH's attorney] on this point," it found that the only item Al Abosy was entitled to "is the compensation on termination provided for in section five of the employment agreement, *** which I read to be 12 months." It

was then agreed that the parties would submit closing cross-briefs, including on Al Abosy's entitlement to a termination payment under the employment agreement. In its written closing brief, LSH argued that section 5 was inapplicable when LSH decides to terminate an employee and that Al Abosy was not entitled to payment because he was terminated "for cause." It alternatively argued that, if he was entitled to a severance payment, it was for only 6 months and not 12, because Al Abosy had been a principal of LSH for only 6 full years. It also contained one sentence that Al Abosy "never claimed this severance payment in his pleadings."

¶ 82    In ruling, the trial court ultimately found that Al Abosy was entitled to 6 months of termination payments under article 5, based upon its finding that he became a principal on January 1, 2009, when he executed the employment agreement, and that he was terminated on September 15, 2015, after completing six full years of service as a principal. It found that he was terminated without cause and rejected the argument of LSH that section 5 applied only when an employee retires or quits.

¶ 83    We set forth these facts to illustrate that Al Abosy was able to succeed on this aspect of his Wage Act claim despite not pleading it and presenting minimal evidence and argument on the issue. It was only after the trial court preliminarily indicated that it intended to find in favor of Al Abosy on this aspect of his claim that it appears to have become an issue in the case. Under these circumstances, we conclude that the trial court did not abuse its discretion in determining that no reasonable attorney fees had been incurred on this aspect of Al Abosy's Wage Act claim. The trial court's statements do not indicate that it was improperly imposing a demand for payment as a condition for awarding attorney fees. Rather, its statements indicate its reasoning that Al Abosy's right to payment under section 5(ii) was "straight forward" and that, if Al Abosy had pointed out that right to LSH and demanded the payment due under that section, any issue of LSH's denial of

such payment could have been resolved without the necessity of a full trial. This was a reasonable conclusion and supports our holding that the trial court did not err in its denial of attorney fees.

¶ 84    F. Hackl's personal liability for violations of the Wage Act

¶ 85    Al Abosy's second argument on appeal is that the trial court erred in determining that Hackl was not personally liable under section 13 of the Wage Act (820 ILCS 115/13 (West 2014)) for LSH's failure to pay to Al Abosy the termination payments under section 5(ii) of his employment agreement. Section 13 of the Wage Act allows personal liability to be imposed on officers or agents of an employer who "knowingly" permits that employer to violate the provisions of the Wage Act. *Id.*; see *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101, 109 (2005).

¶ 86    Following the bench trial, the trial court ruled that Hackl was not personally liable for LSH's Wage Act violations. Acknowledging that section 13 required proof that an officer or agent "knowingly" permitted the employer to violate the Wage Act, the trial court stated that the evidence had not shown that Hackl knowingly permitted LSH not to pay Al Abosy the termination payments called for by section 5(ii) of the employment agreement. The trial found no evidence "that Al Abosy ever made a demand for severance pay or that LSH or any individual made a conscious decision not to pay him." It found no evidence that Hackl had "participated in any decision to deny Al Abosy the severance pay." It found that the evidence actually tended to show that "Al Abosy did not appreciate that he had a right to severance pay under the agreement, and that LSH did not appreciate that it had an obligation to pay him." The court found that, while it remained a "mystery" as to why nobody had looked at the employment agreement, there had been no evidence that either party did look at it or that any conscious decision was made by Hackl to withhold pay from Al Abosy.

¶ 87    Al Abosy argues that the question of Hackl's personal liability for LSH's violation of the

Wage Act is subject to *de novo* review because it involves application of the Wage Act to the uncontroverted facts established at trial. We reject the argument that the appropriate standard of review is *de novo*. As stated above, the trial court's ruling on this issue was based on its conclusion that the evidence at the bench trial had not shown that Hackl knowingly permitted LSH to violate the provisions of the Wage Act, so as to make himself personally liable for them. Our standard of review is thus whether the trial court's factual determination on this question was contrary to the manifest weight of the evidence. A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on evidence. *Longo Realty*, 2016 IL App (1st) 151231, ¶ 19.

¶ 88       Section 13 of the Wage Act allows for the imposition of personal liability on officers or agents of an employer by bringing those individuals within the Wage Act's definition of "employer" under certain circumstances. It provides that, in addition to an individual deemed to be an "employer" under section 2 of the Wage Act, "any officers of a corporation or agents of an employer who *knowingly permit such employer to violate the provisions of this Act* shall be deemed to be the employers of the employees of the corporation." (Emphasis added). 820 ILCS 115/13 (West 2014). It is undisputed that LSH is an employer under section 2 of the Wage Act (*id.* § 2) and that Hackl was an officer and agent of LSH. Further, it is a requirement of the Wage Act that every "employer" shall pay the final compensation of a separated employee in full, at the time of separation, if possible, but in no case later than the employee's next regularly-scheduled payday. *Id.* § 5. An employee who is not timely paid wages or final compensation by his or her "employer" as required by the Wage Act is entitled to recover in a civil action the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid, as well as costs

and reasonable attorney fees. *Id.* § 14(a).

¶ 89 Al Abosy argues that the trial court misconstrued the law and evidence by finding that the Wage Act required a demand for payment by Al Abosy and a conscious decision by Hackl not to make that payment. In summary, Al Abosy argues that he did not need to show a conscious decision by Hackl to specifically deny the termination payment in order for personal liability to be imposed on him. Rather, he argues that it is sufficient that the evidence showed that Hackl was the president of LSH, that LSH was a small organization for which Hackl was the decision-maker, that Hackl had signed Al Abosy's employment agreement and was aware of the obligations contained in it, and that Hackl made the decision to terminate Al Abosy's employment. He also points to Hackl's testimony that since he had been president of LSH, section 5 had been implemented in all cases of shareholders who left the firm.

¶ 90 We hold that the trial court's determination that Hackl did not knowingly permit LSH to violate the Wage Act was not against the manifest weight of the evidence. In doing so, we note that the while the word "knowingly" is not defined in the Wage Act, the term has been held to have a plain meaning. *Kagan v. Waldheim Cemetery Co.*, 2016 IL App (1st) 131274, ¶ 70. "Knowing" or "knowingly" is defined as "[p]ossessing knowledge, information, or understanding" or "[d]eliberate; conscious." American Heritage Dictionary (5th ed. 2020). Black's Law Dictionary similarly defines "knowing" to mean "[h]aving or showing awareness or understanding" or "[d]eliberate; conscious." Black's Law Dictionary 1042 (11th ed. 2019). Nothing in the trial court's statements indicates that it misapplied the plain meaning of the term "knowingly" when it found that the evidence had not shown a conscious decision by Hackl to deny Al Abosy a termination payment due under section 5(ii).

¶ 91 As we set forth above, very little evidence concerning the termination payment due under

section 5(ii) was presented at the trial. There was no evidence presented that Al Abosy was ever aware of his right to such a payment. Similarly, there was no evidence presented that Hackl was ever aware that LSH owed any termination payment under that section to Al Abosy or that Hackl knowingly permitted LSH to deny payment of it. While Al Abosy is correct that the evidence showed that Hackl was the principal decision maker for LSH and knew of the terms of Al Abosy's employment agreement, this is not sufficient to show that he knowingly permitted LSH to deny the payment. There is no strict liability for supervisory employees under section 13 of the Wage Act (820 ILCS 115/13 (West 2014)), as personal liability is reserved "for those individual decision makers who knowingly permitted the Wage Act violation." *Andrews*, 217 Ill. 2d at 109. Here, the trial court's finding that Hackl did not knowingly permit a Wage Act violation and therefore had no personal liability under the Wage Act was not against the manifest weight of the evidence.

¶ 92    G. Whether Al Abosy was entitled to eight months of termination payments instead of six

¶ 93    Al Abosy's final argument on appeal is that the trial court erred in finding that he was entitled to only six months of termination payments under section 5(ii) of his employment agreement. Al Abosy argues that he should be entitled to two additional months of termination payments, one month for his year of service as a "principal" of LSH in 2008 and another for his service in 2015.

¶ 94    Pertinent to this argument, section 5(ii) of Al Abosy's employment agreement provided that if a principal's employment ends under the conditions set forth in that section, LSH would pay a severance payment to the principal "for a Benefit Period, not to exceed twelve (12) months, accrued at a rate of one month for each year of service completed while a Principal." Following the bench trial, the trial court made a factual finding that Al Abosy had become a principal of LSH on January 1, 2009, and that his employment had been terminated on September 15, 2015. Thus, Al Abosy had completed 6 years, 8 months, and 14 days of service as a principal of LSH as of the

date his employment was terminated, and the trial court found that he was entitled to 6 months of termination payments under section 5(ii).

¶ 95    Al Abosy argues on appeal that he should be entitled to an additional month of termination payment for completing a year of service in 2015. He notes that the evidence showed that Hackl told him that, after September 2015, his status with LSH was that of a non-shareholding "principal." He also contends that the undisputed evidence showed that Al Abosy continued to work for LSH on several projects through February 2016 and that Hackl acknowledged Al Abosy's continued work. He argues that the fact that Hackl testified that Al Abosy was working "*pro bono*" after this time does not negate the existence of an employment relationship.

¶ 96    We conclude that the trial court's finding on this issue was not against the manifest weight of the evidence. There was ample evidence to support the trial court's finding that Al Abosy's employment at LSH was terminated on September 15, 2015, that his right to a termination payment commenced at that time, and that he had not "completed" a year of service as a principal for 2015 at the time of his termination. Although Al Abosy testified that he continued to perform work after that date for which he expected LSH to pay him, the trial court was free to reject this testimony and conclude that his failure to keep or submit any records of time worked after that date was inconsistent with any claim that he was expecting to be paid.

¶ 97    As for his argument that he should also be entitled to credit for a year of service completed as a principal in 2008, Al Abosy relies on a prior employment agreement dated January 1, 2008. Al Abosy acknowledges that this document was not submitted at the time of trial but was instead presented to the trial court as an exhibit to Al Abosy's posttrial motion to modify the judgment. As stated above, where an argument is first made in a posttrial motion, the issue on appeal is whether the trial court abused its discretion in denying that motion. *Rahill Corp.*, 123 Ill. App. 3d

at 776. When such a motion is supported by evidence not presented at trial, it is properly denied where it appears that the evidence was in the movant's possession and could have been presented before judgment was rendered or discovered in the exercise of due diligence. *Id.*

¶ 98     Here, as stated above, no transcript of the hearing on the parties' posttrial motions is included in the record. Thus, we have no way to determine the reason why the trial court denied Al Abosy a month of credit for his service in 2008. As the appellant on this issue, Al Abosy had the burden to present a sufficiently complete record to support a claim of error, and in the absence of such a record we presume that the trial court's order conformed with law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92. Any doubts which may arise from the incompleteness of the record are resolved against Al Abosy on this issue. *Id.* at 392. Here, the trial court would have acted well within its discretion to reject Al Abosy's argument on the basis that he failed to submit his 2008 employment agreement at the time of trial, and there was no reasonable explanation for waiting until his posttrial motion to present the evidence. Al Abosy has shown no error in the trial court's denial of his motion to modify the judgment on this issue.

¶ 99                                   III. CONCLUSION

¶ 100     For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 101     Affirmed.